RIPPLE SOLE CORPORATION

v.

AMERICAN BILTRITE RUBBER CO., Inc.

Civ. A. No. 58-405-F.

United States District Court
D. Massachusetts.

March 30, 1961.

Robert A. Townsend, Irving U. Townsend, Jr., Emery, Booth, Townsend, Miller & Weidner, Boston, Mass., Arthur W. Dickey, Harness, Dickey & Pierce, Detroit, Mich., for plaintiff.

Kenway, Jenney, Witter & Hildreth, Melvin R. Jenney, Richard R. Hildreth, Clarence S. Lyon, Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

This is an action for infringement of United States Patent No. 2,710,461, issued June 14, 1955, on the application of Nathan Hack, filed July 14, 1952, for resilient shoe soles. Plaintiff Ripple Sole Corporation is now owner of the patent. Defendant denies infringement and the validity of the patent.

The Hack sole is described in the three claims, all alleged to be infringed, as follows:

"1. A resilient shoe sole formed with a series of spaced parallel resilient projections extending transversely of said shoe sole and at right angles to the length thereof, said projections being inclined rearwardly, whereby weight thereon causes a straight forward movement of the sole as said projections yield under weight.

"2. A shoe sole having formed on its under side a series of downwardly and rearwardly inclined resilient projecting members extending transversely of said sole at right angles to its length, said members having tapering and rounded ends, whereby weight on the sole causes a downward and forward movement thereof.

"3. A shoe sole formed of resilient material with a series of rearwardly inclined projecting members extending transversely of said sole and inclined in parallel relationship from the top toward the rear, the lower ends of said members being rounded, and the sides of the members diverging upwardly to a rounded juncture with the body of said sole."

The development of the sole was an outgrowth of Hack's association with a research project seeking methods of improving paratrooper's boots for the United States Army so as to cushion the shock of landing. Among other methods tried was one of fastening half round loops of resilient material to the soles of the boots. These loops were deformed when used in jumping tests and bent rearwardly. Hacks says that the gliding sensation experienced in walking in boots with the rearwardly bending loops gave him the idea of making a sole with rearwardly sloped resilient projections.

A commercial sole is manufactured by Beebe Rubber Company under license from plaintiff. It is a sole molded of rubber having a series of downwardly and rearwardly inclined projections or undulations placed at right angles to the length of the shoe. These projections are tapered to a rounded off edge which makes contact with the ground. These projections are spaced so that these rounded edges are about three quarters of an inch apart. The actual commercial product differs slightly from the construction shown in Fig. 1 of the patent in that it has a blank space of about an inch at the toe where the patent drawing shows a rib, and it has a heel pad which is longer than the other projections.

The Biltrite sole alleged to infringe has a series of ribs disposed in a chevron arrangement as viewed from the bottom of the sole, each rib coming to a sharp point at the V pointing toward the toe of the shoe. The cross section of each rib has a rear face nearly vertical, while the front face slopes downward and rearward, with the two faces meeting in a sharp rather than a rounded edge.

Plaintiff contends that the Hack sole embodies a novel mode of operation producing new and useful results. The theory of the operation of the sole is as follows. In normal walking the foot in each step is lifted from the floor or ground, moves forward, and then again meets the floor, touching first with the

heel, and then progressively with the rest of the sole. As each of the ribs in turn comes into contact with the floor, the rounded edge at the bottom remains fixed. Due to the resilience of the material and the rearward, downward slope of the rib, the rib pivots forward around the edge as a fulcrum, thus allowing the shoe and the foot to continue their forward motion. This action is described in the patent as a forward propulsion. The ribs are so spaced that one does not interfere with the other and the propulsive action is produced by each rib in turn as it touches the floor and the weight of the body is brought to bear on it.

Plaintiff contends that the Hack sole has the advantage over previous soles of providing a soft cushioning engagement with the floor, and a gradually increasing resistance to the forward momentum of the foot, thus avoiding the shock and fatigue caused by an abrupt checking of the forward movement of the foot. It also provides a controlled forward direction of the cushioning movement to minimize the lateral instability inherent in resilient soles. Moreover, it tends to increase the length of the step or stride without increasing the effort of walking. At times plaintiff has claimed that the length of the stride would be increased as much as six to eight inches.

Plaintiff, to demonstrate and prove the mode of operation and advantages of its sole, relied on certain demonstrations at the trial and on the testimony of one Morehouse, a collaborator of Hack in the development of the sole and owner of a substantial interest in the patent, as to the results of tests conducted by him at the laboratories of the University of Southern California in Los Angeles where he is a member of the faculty.

The chief demonstration at the trial was the so-called "rocking test." In this a subject wearing shoes with Hack soles stood on a platform with his heels at a marked line, and then while standing in place shifted the weight of his body so as to rock forward on his toes and then back on his heels. With each rocking motion he moved forward a measurable fraction of an inch from the starting line. A test made with shoes with ordinary soles and heels showed practically no forward movement. A test with shoes having soles with transverse ribs inclined in a forward direction rather than in the rearward direction of the Hack soles showed a movement backward.

This test, of course, shows that, as might have been expected, the resilience of the sole material can be utilized to produce a forward propulsion. But this test shows nothing about how this forward propulsion operates, if at all, in actual walking to increase the length of one's stride. As Morehouse testified, the forward momentum of the body, absent in these tests, is the chief factor determining length of stride. Moreover, actual walking demonstrations by defendant's expert showed that a shoe equipped with a resilient heel pad and a normal sole can add about 3/8 of an inch to each stride.

Morehouse performed various laboratory experiments designed to measure the increase in stride produced by Hack soles. His earlier tests, made by measuring the distance between foot marks made on paper by a subject walking on it wearing shoes with different types of soles, showed that an ordinary flat sole gave a longer stride than any of the others tested, including the Hack sole. The test relied upon by plaintiff was one in which the subject walked on a treadmill moving at a constant speed. The motion of his right foot was photographed against a yardstick fixed in a stable position in front of the treadmill using a high speed camera operating at 180 frames a second. A small black patch had been placed on the subject's ankle bone. The distance, measured along the yardstick between the extreme forward and rearward positions of the dot as shown in the series of photographs was taken as the length of the stride. On this basis, it was found that the average stride with the Hack sole was .89 inches longer than the average stride in a normal shoe with a flat sole and a rubber heel.

The difficulty with this test is that it does not measure the stride. The motion measured is that of the black dot on the subject's ankle. This is quite clearly composed of several motions—the forward motion of the subject's foot as he brings it forward with each step, the motion of the treadmill, and possibly a motion of the ankle relative to the shoe. It may well be that the compound motion represented by the moving black dot does accurately reflect the length of stride. Morehouse assumed and asserted that it does. However, in the absence of any proof or explanation of how this is so, the court cannot assume that it is. Hence no great weight can be given to the results of this particular test.

In any event the most that these tests would prove is that the Hack sole adds about 9/10 of an inch to the length of a stride. Tests made of the Hack sole by Dr. Karpovich at Springfield College on behalf of the United States Army Quartermaster Research & Engineering Command indicated an increase in stride with Hack shoes of about 2/3 of an inch. In connection with this, it is to be noted that defendant's expert at the trial demonstrated that a resilient heel pad alone, without the rest of the resilient sole structure, could add 3/8 of an inch to the length of the stride. There was, of course, no evidence worth considering to support the claims that the Hack sole would lengthen the stride by 6 or 8 inches. It is difficult to see just what advantage there is to lengthening an average step of 25 to 30 inches by a fraction of an inch. One may theoretically save a few steps or a few seconds of time in getting to one's destination, but such a minuscule benefit is hardly the type of useful discovery which rises to the dignity of a patentable invention. Assuming, as Morehouse contended, that by increasing the size of the rib it would be possible to get the 6 to 8 inch increase in stride claimed for the Hack soles, it is not clear that even this would be any real advantage. Morehouse himself pointed out that each individual has his own optimal length of stride, at which he walks most efficiently, and that an attempt to distort this stride may result in an uneconomical expenditure of effort and energy which will prove tiring.

Ultimately, the claim for any practical advantage of the Hack sole resolves itself into a claim that the wearer can walk with less expenditure of energy. Both parties agreed that this can best be measured by tests determining the relative amounts of oxygen used by a subject while walking in shoes of the different types to be compared. Morehouse testified that someone walking a mile in shoes with Hack soles would save from 6 to 10 per cent of the energy required for walking the same distance in ordinary soles. The only specific test he cited in support of this was one in which a single subject, Morehouse himself, made eight trials in different types of shoes. There was a great variation in the results. The average, however, showed a 5 per cent saving in oxygen consumption. Morehouse himself admitted that this was not a complete scientific study and that his results would not be reliable enough to give a statistically significant difference. In contrast Karpovich in his study for Quartermaster Research made a long series of tests of oxygen consumption using many subjects and arrived at the conclusion that the Hack soles showed no significant difference in oxygen consumption over other soles.

Plaintiff claims that the design of the Hack sole is such as to give greater stability than other types of resilient soles, on the theory that the rearward slant of the projections channels the motion in a forward direction and prevents slipping to the side. It is obvious, however, that apart from design the stiffness of the material is an important factor in the stability of resilient soles. Clearly the Hack sole as actually manufactured gives a much firmer footing than a sole made of a soft sponge rubber, but there is no evidence apart from theorizing, that this is due to the design of the sole rather than to the selection of rubber of the proper resiliency.

A final advantage claimed for Hack soles is comfort. Again it has long been known that soles of resilient material provide a cushion to absorb shock and give the wearer a feeling of increased comfort. Undoubtedly many people have found that shoes with Hack soles are comfortable to walk in. But in the absence of any evidence based on some objective standard of comparison between Hack soles and other resilient soles, there is no way of saying how much of the subjectively felt comfort is due to the cushioning effect of the resilient material used, and how much, if any, is caused by the particular structure of the Hack sole.[1]

In summary, it cannot be found that the Hack structure produces any of the advantages claimed for it. It does not appear that it substantially increases the wearer's stride or results in any advantage, by way of saving of energy or otherwise, from any slight increase in stride it may produce. It cannot be found that any increase in comfort or reduction of shock and fatigue is due to its peculiar structure rather than to the cushioning effect which would be produced by any sole made of similar resilient material.

In this connection it should be noted that Hack also obtained a prior U. S. Patent No. 2,627,676 for a sole similar to the one involved in this action except that the ribs were symmetrical, that is they extended perpendicularly from the body of the sole instead of being inclined rearwardly. This rearward inclination is what distinguishes the present sole from the earlier one and constitutes the essential feature of the sole covered by the patent in suit. Yet the file wrapper of the earlier patent discloses that the same arguments were advanced on behalf of the earlier sole as for the present one—the reduction of shock, the forward gliding motion which lengthens stride and reduces the effort of walking. The claim in the earlier patent was that these results would be produced because the symmetrical rib would necessarily fold back under pressure. Thus it would seem that the distinctive feature of the patent in suit adds nothing to what it was earlier claimed the structure of the prior patent would do.

Even if it be assumed that there was anything in the Hack sole which would constitute a patentable invention, it has clearly been anticipated in the prior art. The prior art shows countless patents for soles of resilient material of every shape and design. Included in these are several which show in all or part of the sole the rearwardly sloping transverse projection of Hack, without, however, specifically pointing out the forward propulsion operation claimed by Hack. Such are the Schneider French patent No. 453,323, the Herbert British patent No. 171,657 and the Smith U. S. patent No. 299,691. It is not necessary, however, to consider whether these fully anticipated Hack, since every essential feature of the Hack sole both as to structure and as to mode of operation is pointed out in the Lacoste French patent No. 902,385, issued in 1945.

The Lacoste patent shows a shoe having a wooden sole with oblique saw cuts extending in a rearward direction so as to form a series of rearwardly sloping support sections. The sole as shown is of a peculiar shape so as to give a high heel effect for a woman's shoe. The patent however points out that it can be made with lower heels for men's shoes. The patent does not limit the sole to wood but points out that it can be made of other similar materials. Rubber is so widely used as a material for soles and so obviously adaptable for use where a flexible material is required that there is no invention in substituting rubber for wood in the Lacoste sole. The Lacoste patent in fact recognizes rubber and leather as being materials commonly used in shoe soles. That the complete mode of operation claimed by Hack was

1. Morehouse conducted certain tests with equipment of his own devising to measure the comparative absorption of heel shock. He himself was not satisfied with the results and did not regard the test as a good one.

first pointed out by Madame Lacoste can be seen from her statement of the advantages of her sole.

"1. Maximum comfort, through absorption of the shocks of walking and because of flexibility distributed from the heel to the toe of the foot.

"At each step, the heel first comes into contact with the ground, and this first shock is absorbed or damped by the elastic flexure of the rearmost support section, and then by the successive flexure of the other support sections occurring continuously along the sole and to its tip as the sole makes contact with the ground under the weight of the person's body. In this way the point of flexure is not centered at the heel, but is on the contrary moved in the direction of the toe, which is a very special advantage which greatly facilitates walking."

The Lacoste patent further claims that its structure tends to increase stability in walking, a further advantage also claimed by Hack.

Plaintiff points out that the Lacoste patent does not call for tapered projections, for rounded edges, or for a rounded juncture of the projections with the body of the sole. These are only minor variations of design which do not go to the essence of the improvement claimed by Hack and play no significant part in the new mode of operation which his sole is said to embody. Plaintiff also claims there is an important difference in that the Hack sole has relatively wide spaces between its projections to allow each projection to operate independently while Lacoste shows only relatively narrow saw cuts so that its support sections would come into contact with one another as they were bent backward under the pressure of walking. This is merely a difference in degree. Lacoste points out as one of its features the independent operation of its projections. To increase the extent of this independent action by increasing the space between the projec-

tions is something that would readily occur to anyone skilled in the art.

Plaintiff also claims that its soles have a record of commercial success which supports its claim of validity. Commercial success may be used to tip the scales in favor of validity in a doubtful case, but it cannot by itself establish validity where as here the patent clearly lacks patentable invention and is clearly anticipated. McCord Corp. v. Beacon Auto Radiator Co., 1 Cir., 193 F.2d 985. Furthermore, the alleged commercial success in this case is not impressive. It is true that after the plaintiff's sole was put on the market in 1955 sales rose rapidly, reaching a peak in the year from June 1958 to June 1959. In the next eighteen months they dropped sharply by about 65 per cent, despite increased expenditures for consumer advertising. Defendant's accused soles followed a similar pattern. Evidence attempting to explain this decline as due to foreign competition was vague. It appears as the most probable explanation that the sole had a certain novelty which enabled it to catch on as a temporary style trend, but it is not established that it has as yet succeeded in permanently capturing any segment of the sole market. Furthermore, it is not clear that any success it has had is due to any patentable aspect of the sole but to such factors as its novel appearance and comfortable feeling. In fact the evidence shows that the most effective selling technique was to persuade the prospective buyer to try on shoes with Hack soles and experience the comfort for himself. But, as has been pointed out, there is no basis on which it can be found that this comfort was due to anything more than the cushioning effect of the resilient material used rather than to the structure of the sole.

The conclusion must be that the patent in suit is invalid because it fails to disclose any patentable invention and is clearly anticipated by the Lacoste French patent.

Judgment will be entered for defendant in accordance herewith.