**WEATHER ENGINEERING CORPORA-
TION OF AMERICA and Weather Engi-
neering Corporation of Canada, Ltd.**

v.

**The UNITED STATES.**

**No. 343–72.**

United States Court of Claims.

Jan. 23, 1980.

Robert E. Manuel, Washington, D. C., attorney of record, for plaintiffs.

James D. Stokes, Jr., Washington, D. C., with whom as Acting Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Thomas J. Byrnes, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

OPINION

PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended decision of Trial Judge Joseph V. Colaianni, filed March 2, 1979, pursuant to Rule 134(h), and on defendant's motion, filed April 26, 1979, to strike certain material from the record *, having been submitted to the court on the briefs without oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth **, it hereby affirms and adopts the decision as the basis for its judgment in this case with plaintiffs' petition, accordingly, dismissed.

OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge: This suit is brought by plaintiffs under 28 U.S.C. § 1498 to recover reasonable and entire compensation for the alleged unauthorized use by or for the United States of the method covered by claim 1 of a patent, entitled "Method and Apparatus for Seeding Clouds." Trial was limited to the issue of liability. The amount of plaintiffs' recovery, if any, was deferred until a final ruling by this court on the question of liability.

The patent in suit, United States Letters Patent No. 3,441,214 (hereinafter referred to as the '214 patent), issued on April 29, 1969, to Jacques d'Avignon and Bernard A. Power, and has, throughout its term, been owned by the Weather Engineering Corporation of Canada, Ltd.[1]

Defendant has, in denying its liability, raised the usual plethora of defenses com-

---

* Though the court deplores the insertion into plaintiffs' notice of intention to except and in their brief to the court and exceptions, of unsupported, unproved and incredible assertions of misfeasance and unlawful activity on the part of defendant, the court does not deem it necessary, especially in view of our disposition of the case, to strike those portions of the documents, and therefore denies defendant's motion to strike.

** Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The other co-plaintiff, Weather Engineering Corporation of America, is an alleged exclusive licensee for all parts of the world except Canada.

mon to patent suits, including the unenforceability of the patent because of fraud and/or inequitable conduct, the failure of the patent to comply with 35 U.S.C. § 112, and the invalidity of the patent under 35 U.S.C. § 103. As a result of an October 15, 1976, order, only the validity of the '214 patent is being considered at this time, all remaining issues being reserved for a later determination, if necessary.

For reasons which will be explained hereinbelow, it is concluded that claim 1 of the patent in suit is invalid since the process would have been obvious to one of ordinary skill in the art at the time that the invention was made.

### The '214 Patent

Over a quarter century ago, as explained by co-patentee Bernard A. Power during his testimony, scientists at the General Electric Research Laboratory in Schenectady, New York,[2] discovered that ice or glaciogenic nuclei could be introduced into a cloud so as to transform the super-cooled liquid water droplets therein into ice crystals. This early work on cold cloud seeding, so-called because the clouds are colder than the freezing point of water, used carbon dioxide or dry ice as the nucleating material.

Dr. Bernard Vonnegut found, as explained by Mr. Power, that the use of dry ice presented certain disadvantages:

It's very heavy. It's bulky. You have to take it up in an aircraft—a fairly good size aircraft. It has to be dispensed—I think shoveled out.

As a result, Dr. Vonnegut set out to determine whether any inorganic crystalline particles existed that performed as well as dry ice as a nucleating agent but without its dispersion disadvantages. Dr. Vonnegut's studies ultimately resulted in the discovery of silver iodide as a nucleating material.

Continued studies established that large quantities of submicroscopic nucleating particles could be generated by the burning of silver iodide. Dispersion into the clouds was accomplished by the rather simple expedient of burning the material on the ground and allowing the smoke to be carried aloft by the prevailing horizontal and vertical wind currents. As a result, much of the early work concentrated on land-based generators and burners for dispersing the silver iodide into the atmosphere. Dr. Vonnegut's investigative work covered such areas as:

(1) Combustion of charcoal briquettes impregnated with silver iodide;

(2) Combustion of a solution of silver iodide and sodium iodide in acetone atomized by hydrogen gas; and

(3) Air-atomization of a silver iodide/sodium iodide/acetone solution into the flame of a turbo-jet smoke generator.

Independent of the work at General Electric, research began in the early 1960's at the Naval Weapons Center, China Lake, California, on developing nucleating materials which contained silver iodide for use with free-falling bomb-like dispensers. These devices, which were to be dropped like bombs from aircraft, were used primarily for hurricane seeding. In operation, the propellants were ignited as the bomb left the aircraft and, as a result, seeding of the clouds with the silver iodide was accomplished.

A major breakthrough in the dissemination of silver iodide in a form suitable for cloud seeding was reported by United States Patent No. 3,127,107, entitled "Generation of Ice-Nucleating Crystals," which issued on March 31, 1964, to Mr. John P. Merryweather and disclosed a detonable nucleating device. The detonable explosive is known in the trade as "Weathercord."

Weathercord is an explosive-type nucleating device which consists of an elongated cord-like material having a core of high explosive contained within a waterproof covering and reinforced with various countering materials. Its core contains approximately 3.2 g. of pentaerythritol tetranitrate

---

2. The three scientists credited by Mr. Power with this early work are Drs. Irving Langmuir, Vincent Schaefer, and Bernard Vonnegut.

(PETN) and 0.8 g. of silver iodide per foot of cord. Weathercord, similar to other explosives, must be detonated by a standard blasting cap.

The importance of the Merryweather invention was confirmed by a Goyer, Grant and Henderson article, entitled *The Laboratory and Field Evaluation of Weathercord, a High Output Cloud Seeding Device*, J. Appl. Meteor. (April 1966), at 211–16. The Goyer, *et al.*, article reported that Merryweather's Weathercord generator, dropped from an aircraft into the updraft core of a cumulus cloud, altered it dramatically. The '214 patent involved in this action is directed to a more refined method of deploying the patented Merryweather device from an aircraft.

### Patent in Suit

The method of claim 1 of the patent in suit is alleged to be safer and more accurate than prior art cloud seeding methods. More specifically, the '214 invention in suit was intended to provide a safe and accurate method for seeding clouds with explosive-type generators. In order to meaningfully evaluate plaintiffs' arguments, a brief description of the patented invention is in order.

The patented structure includes a package for containing an elongated or cord-like explosive of detonable PETN with ice-nucleating silver iodide dispersed throughout its length, as taught by the above-referred-to Merryweather patent. Three blasting caps are attached to the ends of the elon-

gated explosive. In turn, the blasting caps are connected to three black powder fuses which are cut to a length corresponding to the time delay required for the free-falling explosive to reach the desired altitude after its ejection from the aircraft. The other ends of the three fuses are connected by way of standard pull wire igniters to lanyards, which, in turn, are attached to the aircraft frame.[3]

Particularly, emphasis, both during the prosecution of the '214 application and at trial, was placed on the positive ejection-ignition safety feature of the method in suit. This feature was of special importance since the patentees wanted to make sure that no package would reach the ground in an unexploded state and thus be the source of injury to any unsuspecting person who might by chance come upon it. At the same time, the patentees did not want to ignite the package inside the aircraft and risk the chance that they would be unable to timely eject it. Both of these goals are achieved by the above-described package, for after the lanyards are attached to the aircraft frame and the package is rammed down an ejection tube, which extends beyond the main structural framework of the aircraft hull, the fall of the package tauts the lanyards to thereby trigger the pull-wire igniters and light the time-delay fuses as the package is ejected from the aircraft.

The patented method is also claimed to be more accurate than its prior art counterparts.[4] To do the most good, the nucleating

---

3. The parallel, redundant ignition system is an obvious expedient to ensure detonation. In the words of the examiner who was in charge of the '214 application while it was pending in the Patent and Trademark Office:

   "The use of a 'plurality' of detonating devices is merely a duplication of existing elements; the concept of having back-up elements in case of failure is a well-known expedient in the art."

   Mr. Power also testified that the use of plural time fuses and pull-wire lighters was known at the time of his invention.

4. The defendant claims that this advantage of the invention was a mere "afterthought" which cannot render the subject method patentable over the prior art. The conflicting authorities are learnedly analyzed in D. S. Chisum, *"Afterthoughts" and Undisclosed Advantages as Evidence of Patentability: From Salt Dredges to*

*Polystyrenes*, 57 JPOS 437 (1975). He harmonizes the two competing lines by suggesting that "the 'afterthought' characterization seem[s] to express skepticism as to whether the asserted feature [was] really of such importance." *Id.*, 446.

   I take note of the fact that the targeting advantage, while not explicitly noted in the patent, was disclosed to the examiner during its prosecution through the Patent and Trademark Office. It therefore was not a post-infringement "afterthought." Moreover, it appears that this advantage was one which inherently flowed from the method disclosed in the patent. Also, an inventor is not required to recite *every* advantage possessed by his invention. Under these circumstances, the feature can hardly be dismissed as an "afterthought."

284

material must be dispersed within the updraft core of the cloud at the −4 ° to −7 ° C. temperature level. A free-falling device has a fairly predictable trajectory under normal cloud conditions, and the '214 patented method provides for the release of the package at an altitude such that it would be detonated by its time-delay fuses when it reaches the desired horizontal and vertical zone of the cloud.

The cloud seeding methods of defendant, which are accused of infringing claim 1 of the '214 patent, involve the use, since April 29, 1969, by or for various military and civilian government agencies of one or more cloud seeding devices generally identified by the nomenclature WMU–1, WMU–2, WMU–6, WMU–7, WMU–8, WMU–9, WMU–10, and WMU–11 catalyst generators. This WMU family of devices, as well as the prior art cloud seeding devices designated Cyclops II and Alecto, was developed by the Naval Weapons Center at China Lake, California.

Claim 1, in expanded form to emphasize the steps covered by the plaintiffs' patented method, provides:

A method of cloud seeding comprising the steps of:
(a) flying over a cloud to be seeded at a given distance from the cloud in an aircraft,
(b) placing an explosive body containing dispersed ice-nucleating materials connected to a plurality of time-detonating fuses in an ejection zone outside of the aircraft body,
(c) coordinating the time fuse to said given distance,
(d) ejecting said explosive body while simultaneously initiating the ignition of each time fuse as the explosive body is ejected from the ejection zone outside of the aircraft body thereby causing the detonation of the explosive member in said cloud to release the ice-nucleating materials in the cloud.

*Defendant's 35 U.S.C. § 103 Defense*

Defendant argues that claim 1 of the '214 patent is invalid because the differences between the patented method and the prior art are such that the method as a whole would have been obvious at the time of its invention to a person having ordinary skill in the art to which the method pertains. The Supreme Court in the case of *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), set forth the following guidelines by which the obviousness or nonobviousness of a patent is to be measured:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Historical Evidence of Nonobviousness*

Attention initially focuses on plaintiffs' historical evidence of what would have been obvious to a person of ordinary skill in the art. After careful review of plaintiffs' arguments, it must be concluded that plaintiffs have failed to persuasively establish a historical basis for the nonobviousness of their method. To begin, plaintiffs have failed to show a "longfelt need" for a safe and effective method of deploying a detonable nucleating device from an aircraft. Such a demand could not have come into being until after March 31, 1964, the issue date of the Merryweather patent on Weathercord, and perhaps not until April 1966, when the above-referred-to article by Goy-

er, *et al.*, appeared and reported that in March 1965 Weathercord had successfully been used in an actual cloud seeding. The Goyer article "lit a fire" under the patentees D'Avignon and Power, who filed their application for patent in this country on January 9, 1967.

With such a short period of "need," the existence of unsuccessful attempts by others skilled in the art to satisfy the need becomes critical. The record is largely unsatisfactory in this regard. Plaintiffs point to the work of Drs. Goyer, Grant and Henderson, who used a cigarette lighter to ignite their device, dropped it down an ejection tube, and awaited developments. (This device, moreover, was equipped with a parachute.) According to plaintiffs, this "attempt" left unsolved both the aircraft safety problem and the horizontal and vertical targeting problem. Accepting this arguendo, it does not appear that there was any attempt on the part of these gentlemen to come up with a solution. They were primarily interested in the evaluation of the output of Merryweather's Weathercord generator. With the precaution of an oversized ejection tube, to reduce the likelihood of "jamming," they were able to obtain FAA approval of their experimental drops. Goyer, *et al.*, did not need to go any further toward a solution of the safety problem because they were merely carrying on experimental cloud seeding work and were not contemplating the development of a commercial cloud seeding method which employed the Weathercord generator. Nor does the record demonstrate that Goyer, *et al.*, experienced any difficulty in targeting their package.

Moreover, the use of a parachute was essential to the Goyer, *et al.*, experiment, because they were interested in the generator's effectiveness as a line source, and the parachute was necessary to ensure that the cord would unroll into a line source of nucleant.

Beyond this feeble showing, there is no evidence of "failure of others." Contrast the above showing with the situation reported in *Adler Sign Letter Co. v. Wagner Sign Service, Inc.*, 112 F.2d 264, 266, 45 USPQ 387, 388–89 (7th Cir. 1940) (movie theater sign patent):

> During the fourteen-year period from 1920 to 1934, much effort was expended in this field, with no more than a meager amount of success. During that period, literally hundreds of types were offered, tried out, but generally discarded. [Examples of prior art discussed.]

In support of their claim of "commercial success" plaintiffs initially point to WEC-AN's mid-1967 work in Canada. In July 1967, the Labrador area of Canada was suffering a severe drought. A dry cold front came through, and lightning discharges from the storm clouds started a large number of forest fires. Co-plaintiff WEC-AN received a contract from the Province of Newfoundland, and after 5 days of seeding, the rain brought the fires under control. The occurrence of a second front started new blazes. However, cloud seeding was again effective in soaking the entire area, and put out all of the major fires.

From 1967–70, plaintiffs used cloud seeding to increase precipitation over reservoirs in Iran. Mr. Power called this achievement a "landmark in the commercial history of the art," and a highly favorable article appeared in the *U. S. News and World Report*, entitled "Where Rain Making is a Success." Mr. Power reports that the Iranian operation created a great deal of interest in agricultural circles, governmental circles, and within the profession. Numerous governments requested information. This led to a contract with the government of Cyprus for seeding efforts in the spring and fall of 1970. This appears to have been the last commercial use of the patented method.

However, in 1973, the governments of India and the People's Republic of China approached plaintiffs. The Indian deal fell through with the arrival of the extremely heavy 1973 monsoon rains. A Chinese team of experts came to discuss weather modification technology with plaintiffs, and then returned to China. Beyond a request for

additional information and a model of the Weathercord device, nothing further was heard from them.

Defendant contends that the above-referred-to successful efforts are attributable to the use of the Weathercord device, disclosed by Merryweather, and not to the patented method. *Cf. Ripple Sole Corp. v. American Biltrite Rubber Co.*, 192 F.Supp. 551, 556, 129 USPQ 181, 185 (D.Mass.1961), *aff'd*, 302 F.2d 2 (1st Cir.), *cert. denied*, 371 U.S. 876, 83 S.Ct. 146, 9 L.Ed.2d 114 (1962).

Defendant further points out that plaintiffs have not used their method since 1970, and that no one has sought a license under the patent. As to the latter, the most plaintiffs can show is an abortive negotiation with an investment group in Canada for the purchase of the entire company. In the absence of an explanation for the flagging interest in their invention, the value of plaintiffs' evidence of early enthusiasm is seriously weakened.[4A]

Plaintiffs have also not come forward with any evidence relating to their "market share" before and after the issuance of the patent in suit. *Cf. National Lead Co. v. Western Lead Prods. Co.*, 324 F.2d 539, 545 (9th Cir. 1963). They have not shown that competitive methods were disfavored. *Cf. Adler Sign Letter Co., supra.* In short, plaintiffs have not demonstrated that their short-lived commercial success was a tribute to the patented method, rather than to the Merryweather device, or the achievements of the industry in general.

Turning now to a consideration of the remaining *John Deere Co.* guidelines, the art uncovered by defendant is found to generally fall into four broad categories:

(1) the device employed by Goyer, *et al.*, in early 1965 and described by them in the April 1966 issue of the *Journal of Applied Meteorology* ; (2) the Cyclops II and Alecto devices employed by various government agencies as early as 1962; (3) various antecedent patents relating to weather modification devices and techniques; and (4) various antecedent patents relating to airborne delivery and fusing systems.

The pertinence of the first three categories of prior art is self-evident. The pertinence of the fourth category of prior art will become apparent after careful consideration is given to the '214 patent's *raison d'être*. Safety is necessarily an important consideration whenever an aircraft is used to launch an explosive device, whatever its nature.[5] The '214 patent teaches a safe method of launching a detonable nucleating device from an aircraft. It solves an *aircraft safety* problem.

While plaintiffs may argue that the subject matter of the patent in suit restricts the pertinent art to that of cloud seeding and that patents relating to airborne delivery and fusing systems are nonanalogous art and thus not relevant to the question of obviousness under 35 U.S.C. § 103, the argument is not persuasive. Paraphrasing *Geo. J. Meyer Mfg. Co. v. San Marino Electronic Corp.*, 422 F.2d 1285, 1288, 165 USPQ 23, 25–26 (9th Cir. 1970), in which the art of tracking stars and missiles was deemed pertinent to the art of inspecting bottles, the days when inventions relating to locks are only made by locksmiths are past us. In today's world, technological breakthroughs which result from the cross-fertilization of minds trained in different disciplines is

---

**4A.** Plaintiffs assert before the judges that their lack of success is due to defendant's improper conduct toward them, including secret surveillance and commercial attack, but these post-trial assertions (which were not made at the trial) are unsupported by any credible evidence or any proffer of credible proof. We give them no credence [footnote by the court].

**5.** In fact, the article, entitled *The Laboratory and Field Evaluation of Weathercord, a High Output Cloud Seeding Device*, J. Appl. Meteor. (April 1966), at 216, cautioned:

"Finally, since Weathercord is an explosive it should be treated accordingly. Although it is a very stable explosive under normal conditions, its use requires familiarity and compliance with the standard safety regulations for the storage and the use of any explosive material. * * * Any seeding operations from aircraft imply formal approval from the several federal and state government agencies concerned with aircraft operation and public safety."

common. Thus, it is unrealistic to assume or demand that the cloud seeder confine his reading to *The Journal of Weather Modification.*

"The test of analogous arts is similarity of elements, problems and purposes." *Skega Aktiebolag v. B. F. Goodrich Co.,* 420 F.2d 1358, 1359, 164 USPQ 333, 334 (6th Cir. 1970). Human knowledge cannot be compartmentalized or pigeonholed, and the courts have recognized this in evaluating the relevancy of art that comes before them in a 35 U.S.C. § 103 context. The near unanimous approach by the courts is that "[t]he prior art that is relevant in evaluating a claim of obviousness is defined by the nature of the problem confronting the would-be inventor." *Louis A. Grant, Inc. v. Keibler Industries, Inc.,* 541 F.2d 284, 191 USPQ 424, 426 (7th Cir. 1976). *See also Calmar, Inc., v. Cook Chemical Co.,* 383 U.S. 1, 26, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Accordingly, the ejection-ignition problems of the '214 patent are not unique or peculiar to detonable cloud seeding devices which are to be dropped from an aircraft, but would generally be common to a variety of pyrotechnic devices which were intended to be ejected from an airplane.

Similarly, cloud seeding is only one of several applications of airborne detonable devices in which it is important to control the point of detonation. The free-falling device of the patent in suit uses a gang of conventional time-delay fuses to trigger the PETN explosive at the desired altitude. The application involved typical drop-bomb-targeting techniques.

The evidence of record shows that airborne fusing and delivery systems, to meet the safety and targeting problems presented by plaintiffs' use of Weathercord, were in existence at the time of the invention of the method covered by claim 1 of the '214 patent.

### Scope of Prior Art

There appears to be little doubt that the invention of Weathercord by Mr. Merryweather was a significant milestone in the development of cloud seeding nuclei generators. Although the carrying of burner generators of silver iodide by aircraft had been tried, the search for an efficient method of introducing an appropriate amount of nuclei into clouds continued. The ineffectiveness of burner generators was commented upon at 211 of the Goyer, *et al.,* article:

> For several years burner generators have been flown through clouds in an effort to insure that the nuclei are introduced into the clouds. Although a step in the right direction, this operation does not ensure that a sufficiently high concentration of nuclei is injected into the cloud. Considering the speed of a seeding aircraft carrying burner generators, the concentration of nuclei per unit volume is very low.

The article, in comparing the increased effectiveness expected from the use of Weathercord as a nucleating generator over the more conventional burner generators, states at 212:

> Burner generators may finally inject into clouds as large a concentration of nuclei as pyrotechnics or Weathercord but over such a long time duration that the effect of the latent heat is so diluted by heat transfer mechanisms, that it becomes negligible. It is reasonable to believe that the apparent differences in results between the two seeding methods rest not only on the total number of nuclei introduced into clouds but on the release of latent heat of crystallization per unit volume and unit time. In this respect both pyrotechnics and Weathercord should be orders of magnitude more effective than burner generators.

As described by the article, the package for dropping the explosive cord into clouds consisted of a split cardboard cylinder containing a standard meteorological parachute and a cardboard mandrel upon which the Weathercord was coiled. The two halves of the split cardboard cylinder were held together by a rubber band. The Weathercord was connected by way of a blasting cap to a black powder fuse. In addition to igniting the blasting cap, the fuse was connected to burn through the rubber band which held the split cardboard mandrel together.

Following ignition, the burning of a pre-determined amount of the fuse resulted in a breaking of the rubber band and the uncoupling of the two-piece cardboard mandrel. The unrestricted parachute then opened and the Weathercord explosive unrolled to its full length. The article specifically provides that the length of the black powder fuse established the time delay for detonating the Weathercord. Accordingly, upon the burning of the remainder of the fuse, the uncoiled Weathercord explodes and the silver iodide is dispersed at the desired altitude of the cloud.

The method illustrated by the Goyer, et al., article differs from the '214 method in only two respects. First, the methods differ in the manner in which the packages are ignited and ejected from an aircraft. The Goyer, et al., method does not teach the simultaneous ignition-ejection of the package from an aircraft as does the '214 patent. Instead, in the Goyer, et al., method, the blasting cap was connected to the black powder fuse immediately prior to the hand-lighting of the package inside the aircraft. The package was then pushed out of an ejection chute which was built into the baggage door of the aircraft. In addition, the Goyer, et al., package was parachute-retarded while the '214 patent discloses a free-falling package.

However, the defendant has introduced evidence to show that several early simultaneous ejection and ignition aircraft cloud seeding devices, such as the Cyclops II and Alecto, did not use parachutes.

Cyclops II was a free-falling cloud seeding device which was in operation during the 1962 hurricane season. Its design included folding drag fins that were secured to its outer body by a nylon line or cord. Upon release from a bomb shackle that could be mounted internally or externally on the aircraft, the device would fall for several seconds to ensure that it was safely removed from the aircraft. Then, lanyards, which were activated by the release of the device from the bomb shackle, would initiate shroud cutters that severed the nylon cord or line and permitted the drag fins to open. The opening of the drag fins actuated an electromagnetic ignition for setting fire to a pyrotechnic cloud seeding composition.

Similarly, by 1962 defendant had finalized its mechanical design and expulsion-ignition operation of the free-falling Alecto cloud seeding unit. In operation, the Alecto was inserted into a standard M–123 photoflash ejector rack of a B–4 aircraft which could be mounted either internally or externally on the aircraft. Upon receiving a firing electric current or pulse, the Alecto unit was expelled from its rack and an ignition sequence which eventually resulted in the generation of the silver iodide nucleating composition started.

While both Cyclops II and Alecto were essentially free-fall devices that were actuated by time-delay ignition trains, no attempts were made to target them into a particular vertical cloud zone. These devices were used, as previously stated, beginning in about 1962, for hurricane seeding operations.

Finally, additional prior art in existence long prior to the invention date of the '214 patent discloses various ways of ejecting other kinds of pyrotechnic devices from aircraft while simultaneously igniting one or more time-delay fuses.

First, United States Letters Patent No. 1,173,515 to Harold E. S. Holt, which issued on February 29, 1916, shows an aerial illuminating device which is to be ejected from an aircraft. In operation, upon the discharge of the device, a lanyard or pull wire lighter initiates the ignition of a time-delay fuse. In this manner, premature ignition of the flare before the device leaves the aircraft is avoided.

Similarly, United States Patent No. 1,237,266, entitled "Incendiary Attachment for Aeroplanes," and which issued to Mr. Lewis Nixon on August 14, 1917, was directed at an arrangement for igniting an incendiary bomb simultaneously with the bomb's ejection from an airplane in order to maximize fire damage. The ignition of a bomb at a predetermined altitude above the ground, as provided for by the '214 patent

in suit, was also of concern to Nixon. Specifically, the patent states:

> Stored in the casing 3 is the projectile 9, which is in the form of a long woven sheath or tube, filled with incendiary material, and to the upper end of this sheath is connected a slow-burning fuse 10. This slow-burning fuse is preferably graduated as shown in Fig. 2. The rate of burning being known, and the height of the aircraft above the ground being known, if this fuse be ignited at the proper point, it will set fire to the inflammable column at any desired time before the said column reaches the ground, and thus will insure that the incendiary material is burning fiercely when it reaches the object to be set on fire.

Speaking to the simultaneous ejection and ignition feature of the '214 patent, the Nixon patent provided an opening in the airplane floor for discharge of the bombs. In operation, an electrical ignition circuit was operated to ignite the fuse at the same time that the bomb fell through the opening on the floor of the aircraft.

### Level of Ordinary Skill and Obviousness

On the basis of the prior art literature of record, and the training and experience of the various witnesses that appeared before me at trial, I conclude that the level of ordinary skill in the art is that of an applied meteorologist having some acquaintance with the construction and use of explosives. Accordingly, the question to be answered is whether the method covered by claim 1 of the patent in suit would have been obvious, within the meaning of 35 U.S.C. § 103, to such a person. The record clearly indicates that it would have been.

To begin, the Merryweather patent teaches that an explosive nucleating device, Weathercord, could be carried aloft by an aircraft for detonation in the air. The Nixon patent teaches that a time-delay fuse could be used in conjunction with a free-falling incendiary bomb to trigger it at any desired altitude. These teachings are combined in the Goyer, et al., article which shows that Weathercord could be dropped from an aircraft and the explosive PETN detonated at a predetermined altitude as established by the length of a black powder fuse.

Merryweather also suggested that his device, equipped with a time-delay fuse, might be carried aloft by a balloon whose rate of ascent was known. The Patent Office examiner, during the prosecution of the '214 application, opined that it would be obvious, in view of the Merryweather teaching, to eject such a device "for free fall from an aircraft." Applicants, instead of challenging the examiner's reading of Merryweather, amended their claim to stress the simultaneity of the ejection of the device and the initiation of its ignition train.

Nor is it nonobvious to use a free-falling device to seed clouds. Cyclops II and Alecto both fit this bill, and at the trial Mr. Henderson, a coauthor of the above-referred-to Goyer, et al., April 1966 *Journal of Applied Meteorology*, testified:

> [T]he first thing you think of is * * * let's dump something out of the airplane and make it detonate and so one of the things you do is just wrap some * * * weathercord around the cylinder and light a fuse and throw it out and see what happens.

Thus it is inconceivable that an applied meteorologist would ignore the need to seed a cloud's updraft core at an altitude at which the nucleating material would be effective. Having determined the altitude, no inventive skill is required to employ the teachings of Goyer, et al., or Nixon and use a time-delay fuse to see that the explosive is triggered at the desired elevation.

In addition, the prior art recognized that considerable care was needed when explosives were handled in airplanes. A person of ordinary skill in the art would unquestionably have discerned and defined all of the aircraft safety and nucleant targeting problems dealt with by the claim 1 method of the '214 patent.

The dangers attendant with igniting a detonable device inside an airplane were well known at the time of the '214 inven-

tion. If safety dictated that the explosive was not to be ignited before ejection from the aircraft, it obviously must be ignited either simultaneously with or after ejection.

Having decided on a simultaneous ignition and ejection, a diligent search of existing prior art makes the '214 solution to the problem obvious. No special perception is necessary to conclude that the teachings of the Holt and Nixon patents could be used to eject a device such as disclosed by the patent in suit, or a pyrotechnic flare. Even ignoring the above-referred-to prior art patents, an applied meteorologist would also find it obvious to substitute the detonable device described in the Merryweather patent for the Cyclops II and Alecto devices, and launch it as the Government had launched the latter devices. In this fashion, the ejection would be simultaneous with the initiation of ignition as provided by the claimed method.

Thus an applied meteorologist following the suggestions of the Goyer, et al., article for aircraft seeding of clouds would find it obvious to provide the Weathercord explosive nucleating device of the Merryweather patent with time-delay fuses for detonation at a desired altitude. Further, such a person would, if a simultaneous ejection-ignition was desired, find it obvious to employ the teachings of either the Nixon or Holt patents or the Cyclops II or Alecto free-falling devices. Accordingly, all of the steps called for by method claim 1 of the '214 patent would have been obvious within the meaning of 35 U.S.C. § 103 to a person of ordinary skill in the art.[6]

Based on the above analysis, it must be concluded that claim 1, the only claim of the '214 patent involved in this action, is invalid.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.

---

6. Having concluded that the steps of claim 1 would have been obvious to a person of ordinary skill in the art, it is unnecessary to treat the 35 U.S.C. § 112, and fraud and/or inequitable conduct arguments of defendant.