**MINNESOTA MINING AND
MANUFACTURING CO.,
Plaintiff,**

v.

**RESEARCH MEDICAL, INC.; Peter
Von Berg; and Peter Von Berg, a
corporation, GmbH, Defendants.**

No. 84–C–0728S.

United States District Court,
D. Utah, C.D.

Oct. 22, 1987.

Laurence H. Pretty, Gary A. Clark, Los Angeles, Cal., David A. Greenwood, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, Walker N. Kirn, Robert

W. Hoke, Minnesota Min. & Mfg. Co., St. Paul, Minn., for plaintiff.

H. Ross Workman, David O. Seeley, Workman, Nydegger & Jensen, Louis M. Haynie, Research Medical, Inc., Salt Lake City, Utah, for defendants.

## REVISED MEMORANDUM DECISION

SAM, District Judge.

This action arises from the alleged inducement to infringe and infringement, by defendant Research Medical, Inc. (RMI), of all claims of U.S. Patent No. 4,129,129, entitled "Venous Return Catheter and a Method of Using the Same," (the '129 patent) held by plaintiff Minnesota Mining and Manufacturing Co. (3M). RMI asserts the invalidity and unenforceability of the patent, and denies infringement. It further asserts patent misuse by 3M. Trial was before the court without a jury.

## I. THE PARTIES

3M is a Delaware Corporation having its principal place of business in St. Paul, Minnesota. RMI is a Utah corporation having its principal place of business in Salt Lake City, Utah. Named defendants Peter Von Berg and Peter Von Berg GmbH are, respectively, a German businessman residing in Munich, Germany and a West German corporation that he owns and controls. The Von Berg defendants will not be considered in this opinion as they entered into a Consent Judgment with 3M.

## II. JURISDICTION

3M brings this civil action for patent infringement under Title 35, United States Code, particularly sections 271, 281 and 283–85. This court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1338(a). Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1400(b).

## III. FACTUAL BACKGROUND

This case involves catheters used to drain blood from the heart chambers for treatment in a heart-lung machine during surgery requiring cardiopulmonary bypass. While the heart is stopped, the heart-lung machine performs the functions normally conducted by the heart and lungs. Blood depleted in oxygen and rich in carbon dioxide is mechanically drained from the patient, and pumped to equipment that restores oxygen to the blood and removes excess carbon dioxide. This drainage is referred to as "venous return" or "venous drainage." The '129 patent is a two-stage venous return catheter used to drain blood from the right atrium and the vena cavae by a process known as dual cannulation.

During a bypass operation, it is extremely important that adequate amounts of blood be drained to allow for proper oxygenation and decarbonation. Insufficient oxygen can result in serious tissue damage, and inadequate removal of carbon dioxide can alter the metabolic functions of critical enzymes. Two of the most important factors in regulating the flow of blood are the design and placement of the drainage catheter. Various methods have been used by surgeons, including the insertion of one catheter in the superior vena cava (SVC) and another in the inferior vena cava (IVC) in order to collect venous blood returned to the patient's right atrium. Although reliable, the dual cannulation procedure using separate catheters requires two incisions through the atrial wall as well as sutures of both insertion points. Use of two catheters also reduces the space in which a surgeon may operate. Many surgeons prefer the single catheter because the cannulation process is shortened, the risk of infection lessened and the surgical site cleared. A single catheter known as a "dual drainage" catheter may be positioned so the leading tip rests in the right atrium, the SVC or the IVC.

### A. *The Amrine two-stage venous return catheter (the '129 patent)*

The '129 patent is a dual drainage catheter having two diameters of tubes connected by a molded reducer (Fig. 1).[1] Six horizontal drainage slots (Fig. 1a) are evenly

---

1. Following are the '129 patent claims:
 *Method claim 1*

In a method of by-passing blood flow from the heart during open heart surgery, those steps which comprise:

spaced on the rounded tip (Fig. 1b) of the smaller, first-diameter, pilot tube (Fig. 1c). The first-diameter tube tapers into the larger second-diameter tube (Fig. 1d) by means of a molded juncture (Fig. 1e) that has elongated slots (Fig. 1f) to allow blood to drain from the right atrium where the juncture rests. A tubular obturator (Fig. 1g) is placed in the catheter to the first drainage openings to block the second drainage openings during the initial insertion of the catheter.

(a) introducing a venous return catheter into the right atrium of the heart and extending the catheter into the IVC.

(b) providing first drainage openings in the catheter adjacent the end of the catheter in the IVC,

(c) providing second drainage openings in the catheter spaced from the end to lie in the right atrium, and

utilizing a single tube in the catheter to carry the blood flow from the IVC and the right atrium to extracorporeal life support equipment.

*Method claim 2*

A method as defined in claim 1 in which a tubular obturator is inserted into the catheter to the first drainage openings during initial insertion of the catheter, and

removing the obturator after the second drainage openings have entered the right atrium.

*Method claim 3*

In a method of by-passing blood flow from the heart during open heart surgery, those steps which comprise:

(a) *circumferentially suturing the right atrial appendage,*

(b) surgically entering the right atrial appendage,

(c) releasing the suture and inserting a venous return catheter into the right atrium of the heart and extending the catheter into the IVC,

(d) providing first drainage openings in the catheter adjacent the end of the catheter in the IVC,

(e) providing second drainage openings in the catheter spaced from the end to lie in the right atrium, and

(f) utilizing a *single tube* in the catheter to carry the blood flow from the IVC and the right atrium to extracorporeal life support equipment.

*Method claim 4*

A method as defined in claim 3 in which a tubular obturator is inserted into the catheter to the first drainage openings during initial insertion of the catheter, and

The catheter is introduced into the right atrium of the heart and extends into the IVC (Fig. 2d). The right atrial appendage is circumferentially sutured (Fig. 2a) and clamped (Fig. 2b), and the catheter is inserted into the atrium as the suture is released (Fig. 2c). When insertion is complete, the first drainage openings lie in and drain from the IVC (Fig. 3a), and the second drainage openings lie at the edge of and drain from the right atrium (Fig. 3b). The obturator (Fig. 1g) is removed after

removing the obturator after the second drainage openings have entered the right atrium.

*Apparatus claim 5*

A two-stage venous return catheter for insertion into the right atrium and IVC of the heart to drain blood of the patient to an extracorporeal life support machine which comprises:

(a) a first diameter tube having an insertion end portion,

(b) a rounded nose portion on the insertion end of said tube having circumferentially spaced elongate slots on the sides to admit fluid,

(c) an enlarged second diameter portion on the tube spaced from the end portion, and

(d) a juncture between the first- and second-diameter portions, and

having elongate slots to admit fluid into the enlarged portion.

*Apparatus claim 6*

A two-stage venous return catheter as defined in claim 5

in which the juncture portion tapers gradually from the first-diameter portion to the second-diameter portion.

*Apparatus claim 7*

A two-stage venous return catheter for insertion into the right atrium and IVC of the heart to drain blood of the patient to an extracorporeal life support machine which comprises:

(a) a first-diameter tube having an insertion end portion,

(b) a rounded nose portion on the insertion end of the tube having circumferentially spaced elongate slots on the sides to admit fluid,

(c) an enlarged second diameter portion on said tube spaced from the end portion,

(d) a juncture between said first and second diameter portions having elongate slots to admit fluid into said enlarged portion, and

(e) a removable obturator tube having a slip fit with the inner diameter of the first-diameter tube to block flow through the slots in the juncture portion during insertion of the catheter into the atrium and IVC.

**1042**

the second drainage openings enter the
right atrium.

The '129 Patent.

Fig. 1

Fig. 2

Fig. 3

8a

B. *Development and prosecution history of the '129 patent*

In 1970, Sarns, Inc. (Sarns),[2] a medical products company, hired Bruce Amrine as a design engineer, and later promoted him to sole project engineer for the entire Sarns catheter product line. Amrine alleges he drew his first sketch of the two-stage catheter on September 26, 1975 and a second on November 11, 1975. Blueprints of the catheter were drawn in December 1975 and January 1976; fourteen prototypes were made in February 1976, and sent to three or four surgeons for testing.

The application that resulted in the '129 patent was filed on March 18, 1977, with method claims 1–4 and apparatus claims 5–7. In the Office Action of the '129 application, only apparatus claim 7 was allowed. Method claims 1–4 and apparatus claims 5 and 6 were rejected as unpatentable for their failure to distinguish over prior art. Amrine successfully argued to the patent examiner that all claims should be allowed.

C. *The RMI patent (Polaris catheter)*

The accused product, the Polaris catheter (Fig. 4), is a unitary catheter comprised of a small-diameter tube (Fig. 4a) that gradually tapers to a large-diameter tube (Fig. 4b). The lead tip is slotted (Fig. 4c), and secondary holes (Fig. 4d) are located on the flat portion of the large-diameter tube, directly above the tapered junction. The catheter may optionally be provided with wire reinforcement to prevent kinking (Fig. 4e). Instructions included with the Polaris catheter suggest insertion into the SVC only.

In the first Office Action on the Polaris catheter, the patent examiner rejected all claims as being "anticipated by Amrine," in that every element found in the rejected RMI claim was found in the same combination in Amrine's patent. By responsive amendment, RMI added the additional limitation to claim 1 that emphasized RMI's invention was directed to the reinforcing collar in the gray areas of RMI's unitary catheter. RMI eventually obtained a patent on the amended claim 1.[3]

2. Sarns became a wholly owned subsidiary of 3M some time after Amrine developed his catheter.

3. The amended claim 1 reads:
 1. A catheter for use in the venous drainage of blood during surgical procedures involving cardiopulmonary bypass, comprising:
 a first diameter catheter portion forming the distal end of the catheter, said first diameter portion being suitable for placement within a vena cava returning venous blood to a patient's heart, said first diameter portion being provided with at least one drainage opening through which blood can drain;
 a second diameter catheter portion forming the proximal end of said catheter, said second diameter portion being in fluid communication with the first diameter portion, the second diameter portion having a larger diameter than the first diameter portion, said second diameter portion being provided with at least one drainage opening through which blood can drain, *said second diameter portion being further provided with substantially continuous reinforcement means at the location of each such drainage opening such that the reinforcement means reinforces the second diameter catheter portion surrounding the periphery of each such opening;* and
 a second transition catheter portion between the first and second diameter portions, forming a smooth transition between the first diameter portion and the second diameter portion.
 (Emphasis in original).

The Polaris Catheter

Fig. 4

OPINION

## IV. VALIDITY OF THE '129 PATENT

Several sections of Title 35 U.S.C. are relevant to RMI's challenge to the validity of the '129 patent.[4] Under 35 U.S.C. § 102(a), public knowledge or uses by others before Amrine's invention date is prior art over which his claims must distinguish. Section 102(b) provides that irrespective of Amrine's invention date, printed publications or public uses or sales more than one year before the application filing date are prior art. Section 102(f) requires that Amrine himself be the inventor of the claimed subject matter. Section 102(g) contains rules regarding abandonment, concealment and suppression as well as conception and reduction to practice. Section 103 requires that the claimed invention be unobvious to one of ordinary skill who is presumed to have knowledge of all the relevant prior art. If RMI should successfully carry its burden under any one of these sections, the affected claims are invalid.

### A. *Asserted prior art*

RMI contends that prior art references, not submitted to the United States Patent and Trademark Office (PTO), show lack of inventiveness and obviousness sufficient to defeat the '129 patent. The references considered by the court include the works of Dr. Charles Bailey, Dr. Michael Chiechi, Dr. John Flege and Richard Berryessa, as well as a reference to an article co-au-

4. Section 102, U.S.C. 35 provides, in relevant part:
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for a patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

. . . .
(f) he did not himself invent the subject matter sought to be patented, or
(g) before the applicant's invention thereof the invention was made in the country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

thored by Dr. Edward A. Fitch and Dr. Bailey.

### 1. Dr. Charles Bailey

Dr. Charles Bailey, an eminent clinical professor of and pioneer in cardiac surgery,[5] testified that in 1959 he abandoned the dual cannulation technique that required two cannulae, and began using a single catheter venous drainage procedure. That same year, Dr. Bailey and one of his students, Dr. Blanco, contributed to an article entitled, "Single Catheter Gravity Drainage of the Right Atrium or Right Ventricle During Total Cardiac Bypass."[6] Although the article does not specifically mention drainage from the IVC, RMI asserts the publication teaches insertion of a single-diameter catheter with several drainage openings through the right atrial appendage in a manner that facilitates drainage from the coronary sinus as well as the SVC and the IVC. Dr. Bailey also testified he followed the described method of insertion that placed the tip of the catheter into the IVC. He used the Blanco catheter in approximately one-third of his operations from 1959 until his retirement in 1977. During that time, Dr. Bailey trained approximately 75 residents in the catheter's use, and demonstrated it to numerous visiting surgeons.

Dr. Bailey discovered the Blanco catheter was too large for use on small individuals. To solve that problem, he used a tapered catheter (modified by the addition of sideholes) that fit easily into the IVC. The same methods of insertion through the right atrium were used with the tapered catheter. A 1962 publication authored by Dr. Hirose and Dr. Bailey discussed their addition to the tapered catheter of external corrugations designed to prevent the catheter from slipping out while in use. The smaller-diameter tip was designed to fit any vessel, and the sideholes reduced turbulence in the flow of blood. Dr. Bailey testified that neither he nor any of his colleagues attempted to keep secret the Blanco or tapered catheters and their refinements.

3M contends that Dr. Bailey's testimony is unreliable as it is not corroborated by publication or witness. It also contends the Blanco text does not teach insertion of the catheter into the IVC, and the text should be considered over drawings.

■ Evidence of prior art must be clear and convincing; however, the court may rely on oral testimony alone when it finds the testimony meets the clear and convincing standard. The court recognizes Dr. Bailey's preeminence in the field of cardiovascular surgery, and considers him the best possible source concerning how he conducted his early surgeries. His careful, repeated testimony that he inserted a slotted single tube into the IVC is found credible on every point.

### 2. Dr. Michael Chiechi

Dr. Bailey and Dr. Peter Poulos[7] testified they both observed and worked with Dr. Michael Chiechi,[8] a cardiovascular surgeon who, developed and used a two-diameter, two-stage venous return catheter that was inserted into the IVC.[9] Dr. Chie-

5. Dr. Bailey was a recipient of the Shiely/Deknatel Award in 1980, an award given the most distinguished pioneers in cardiac surgery for the period 1940 to 1980. He received several other coveted awards in his field, published hundreds of papers on cardiac surgery and served in leadership positions in his professional organizations. Dr. Bailey wrote for and edited several textbooks and journals related to cardiac surgery.

6. Dr. Blanco is listed as lead author on the article.

7. Dr. Poulos is a thoracic surgeon who developed and founded seminal open-heart surgery programs in New York and New Jersey. He was a member of the team that helped set up the heart surgery program at St. Michael's Hospital in Newark, New Jersey.

8. Dr. Chiechi served as the Director of the Department of Cardiovascular Surgical Research and conducted heart surgery at St. Michael's Hospital in Newark, New Jersey. He invited Dr. Bailey to visit the hospital once a week to conduct surgery and teach surgical techniques.

9. Dr. Bailey's teaching visits to the cardiac clinic in St. Michael's Hospital are documented in an article entitled, "Cardiac Surgery in a Community Hospital." Authored by Dr. A.D. Crecca, Dr.

chi created his two-diameter catheter by cutting off the tip of a small-diameter catheter and securing it within a larger catheter; he created the two-stage effect by punching holes in the lead tip of the small-diameter catheter and below the juncture where the two tubes meet. Both Dr. Bailey and Dr. Poulos testified Dr. Chiechi's method required placing a purse string suture in the atrial appendage, incising the appendage and inserting the catheter through the incision so that the small-diameter tip lay within and drained from the IVC, while the large-diameter tube drained from the right atrium.

Dr. Bailey testified Dr. Chiechi began using the two-diameter catheter in 1965, and Dr. Poulos testified Dr. Chiechi had already been using the catheter when Dr. Poulos joined the St. Michael's staff in 1969. Both said Dr. Chiechi continued his use of the two-diameter catheter well into the 1970s [10] and never attempted to conceal his catheter or the method of its use.[11]

3M argues Dr. Chiechi's work does not constitute prior art because it was limited to use in a hospital staffed by only four cardiac surgeons, and Dr. Chiechi ceased to use the catheter after a period of time. 3M also points out Dr. Chiechi never published an article describing his two-stage catheter and placement of it in the IVC, and his work is corroborated only by the oral testimony of Dr. Bailey and Dr. Poulos. Further, Dr. Chiechi's perfusionist, Ukrainsky, said the catheter was inserted only five or six inches into the heart. The court finds credible the testimony of Dr. Bailey and Dr. Chiechi, and is not moved from that finding by Ukrainsky's statement. The attending surgeons who witnessed and discussed the surgeries were in a better position to know the exact placement of the Chiechi catheter than was the perfusionist. For reasons set out below in its discussion of the section 102 public use doctrines, the court rejects all 3M's arguments that Dr. Chiechi's work does not constitute prior art.

### 3. Dr. John Flege

Dr. Flege, a well-respected cardiac surgeon in Cincinnati, Ohio, began performing coronary artery bypass surgery in 1969 or 1970. Assisted by his perfusionist/surgical assistant, Gerald Hancock, Dr. Flege experimented with various types of cannulae in an effort to maximize drainage and decrease blood loss. They first tried to increase drainage by cutting a large hole in the side of a Sarns 51 French catheter, then inserting the catheter through the right atrial appendage and placing the tip some distance into the IVC. This version of a two-stage catheter increased drainage, but damaged atrial tissue when removed. A later modification avoided tissue damage by substituting two oval holes for the one single hole.

Dr. Flege and Hancock testified they considered the 51 French a two-stage catheter because they inserted it through the right atrial appendage and into the heart, with the slotted lead tip resting in the IVC and the secondary drainage holes in the right atrium. The modified catheter was so effective that Dr. Flege stopped experimenting, and used it routinely in an estimated 50 to 100 operations. Dr. Flege and Hancock testified they made no attempt to keep the catheter secret, and showed it to any interested visitors.

Continual success convinced Dr. Flege and Hancock their catheter was a "pretty good piece of equipment," and they wanted to find a company to manufacture it. While ordering other equipment related to heart-lung surgery, Hancock had worked closely with John Covert, a salesperson for Sarns Corporation. Hancock telephoned

---

J.V. Crecca, Dr. Chiechi and Dr. N.A. Antonius, the paper was presented at the 1962 Connecticut State Medical Society meeting.

**10.** Dr. Bailey stated he observed Dr. Chiechi use his catheter on at least six different occasions, and actually assisted him twice. Dr. Bailey also successfully used a Chiechi catheter himself. Dr. Poulos never used a Chiechi catheter, but assisted Dr. Chiechi once or twice a month for three to four years on operations in which that catheter was used.

**11.** Dr. Bailey testified he frequently discussed over lunch with Dr. Chiechi and visiting surgeons, the various venous return cannulae, in the hope the various ideas exchanged would be used freely.

Covert who referred him to Amrine, the Sarns representative in charge of new products development. In his initial telephone conversations with Amrine, Hancock shared the information concerning his two-stage catheter, and Amrine responded Sarns was interested in developing a disposable line of catheters. Amrine never mentioned that Sarns or he was developing a two-stage catheter. On March 12, 1976, within the month following his telephone conversations, Amrine traveled to Cincinnati to observe the use of the modified Sarns 51 French catheter. Dr. Flege and Hancock discussed with Amrine the construction and use of the catheter, and permitted him to observe its performance during open heart surgeries by Dr. Flege. Hancock considers significant his conversation with Amrine regarding the placement of the side holes to facilitate drainage from the right atrium. Although Hancock could not specifically recall telling Amrine the tip should be placed in the IVC, Hancock testified that was the procedure he explained to everyone he had shown the catheter. Amrine did not carry to Cincinnati any drawings or prototypes of work he had done on a two-stage catheter, nor did he make any suggestions regarding the modified 51 French. Hancock stated Amrine seemed very interested in the modifications.

Amrine's trip report notes included the following entry: "Sarns 10150 with added holes to improve SVC return when heart manipulated or lifted, inserted to last 'S' on cannula. They claim tip of IVC—atrial junction." Plaintiff's Exhibit (PX) 24. The report further stated: "I don't believe side holes are the ultimate answer." *Id.*

On March 17, 1976, Dr. Flege wrote Amrine concerning two successful extensions of the Sarns catheter into the IVC.[12]

#### 4. Richard Berryessa

Berryessa is a perfusionist who worked with Dr. Harold Liddle, a cardiac surgeon at L.D.S. hospital in Salt Lake City, Utah.[13] Dr. Liddle and Berryessa became acquainted with Bruce Amrine while serving on one of the clinical evaluation teams for the Sarns two-stage venous return catheter. On July 22, 1976, Berryessa received a letter confirming Amrine's visit to Dr. Liddle on August 12 and 13, 1976. During the visit, Amrine observed a heart by-pass operation in which the resident experienced difficulty while inserting the Sarns catheter, and the resulting blood loss was so great that Amrine said of the experience that he "just about died a thousand deaths." Berryessa discussed with Amrine other instances of blood loss that occurred when the Sarns catheter was used. Rather than suggesting the use of the obturator (a device used to close an opening) that Amrine maintains he conceived from the time of his first drawing, Amrine told Berryessa he had never heard of the blood loss problem. He offered no solution because he considered it a result of Dr. Liddle's team not knowing how to insert the Sarns catheter.

Within three days of Amrine's visit, Dr. Liddle and Berryessa developed their own solution to the blood loss by inserting a 22 French 5cc Foley catheter into the Sarns catheter. The Foley catheter has a small balloon (a 5cc bag) near its tip, and when inserted into the Sarns catheter, the deflated balloon rests against the mouth of the smaller diameter tube, forming a temporary seal. Air pressure forces the blood through the Foley catheter that blocks the interior of the large-diameter tube of the Sarns catheter. Insertion of the Foley prevents the loss of blood that occurs as the

12. The relevant paragraph of Dr. Flege's letter reads:

> To me the extension seems a little long for use in the superior vena cava and I believe that if it were shortened to two inches instead of the present three inches, that it would be more suitable. We used the catheter twice with the extension passed into the inferior vena cava. I though [sic] the extension extended a bit too far when it was used in this fashion, but in the inferior vena cava, the

> length seemed to be perfectly all right. However, I think the shorter extension would be equally good for either superior vena cava or inferior cava application.

13. Berryessa's duties as a perfusionist include opening the tubing pack in which catheters arrive, checking them for rough edges, tying the connectors to the heart-lung machine and handing the catheters to the scrub nurse.

tip of the Sarns two-stage venous return catheter is inserted into the right atrium, and the blood flows into the catheter through the holes in the tip and out through the secondary holes in the molded reducer. The method for inserting the catheter is precisely the same as that described by Dr. Bailey, Dr. Chiechi and Dr. Flege, involving entry through the right atrium and placement of the tip into the IVC or the SVC.

On August 15 or 16, 1976, Berryessa telephoned Amrine to discuss Dr. Liddle's and Berryessa's success in preventing blood loss through the use of the Foley catheter as an obturator. At Amrine's request, Berryessa sent him a memorandum and drawing of the Foley catheter inserted into the Sarns catheter. Berryessa penned the following on the drawing: "Bruce, we now put a 22 French Foley 5cc bag not inflated in your two-stage venous catheter. This eliminates any blood loss through the right atrial drain holes when putting it in or removing it." By the time Berryessa sent the letter, Dr. Liddle and he had used the described catheter at least once with great success, and they had continued to use the Foley obturator.

On October 14, 1976, Berryessa received a letter from Amrine that had been sent to all clinical evaluation teams for the Sarns two-stage venous return catheter. The fourth paragraph of the letter stated: "At the present time, we do not have prototype catheters equipped with the experimental proposed obturator we can send to you for trial. However, we have found that a 22 French Foley catheter closely duplicates the function of the proposed obturator and could be used experimentally." Berryessa said he was amused by the letter because it contained the solution to the problem Amrine contended was a result of the inexperience or ineptitude of Dr. Liddle's team, and the letter read as if Sarns discovered and developed a solution to a general problem.

In a Sarns evaluation form dated October 18, 1976, Berryessa wrote: "We have been using the 22 French Foley since we began our evaluation of this catheter. The obturator is effective both on insertion and removal of the catheter." On October 22, 1976, Berryessa received the following note from Amrine: "By now you have probably received the questionnaire concerning the obturator for the two-stage venous return catheter. Although it seems redundant since it was your idea, I would appreciate it if you would complete it and return this questionnaire as it is important for project records." Berryessa testified Amrine never indicated he had conceived of using an obturator to prevent blood loss, indeed, before his discussion with Berryessa, Amrine didn't realize the need for it existed.

The court rejects Amrine's explanation that from his beginning conception the obturator was a component of his alleged invention, and he was merely waiting for clinical testing to discover whether it was necessary. The weight of the evidence shows Dr. Liddle and Berryessa introduced Amrine both to the obturator's necessity and its successful implementation into the Sarns catheter.

### 5. Fitch reference

In 1958, Dr. Edward A. Fitch and Dr. Bailey co-authored and published an article entitled, "Obturators for Extracorporeal Circulation and Cannulae." The article recognized the problem of blood loss on the insertion of the catheter as well as the need to reinforce a flaccid catheter to insure accurate placement. The suggested solution requires placement inside the main catheter of an obturator consisting of an annealed copper shaft. The article concludes that "[t]he [obturator] transforms the flexible, collapsible, kinking catheter into a semi-rigid shaft for leisurely cannulation."

RMI points out the obturator permits bending the catheter to facilitate drainage, and no bending would be necessary unless the catheter were inserted into the IVC. Thus the Fitch reference, although not as compelling as the other references cited, should be considered prior art to the development of a catheter for insertion into the IVC.

### B. *Public use, sections 102(a) and (b)*

■ 3M contends the prior art brought forward by RMI was not sufficiently public

to constitute prior art, that is, the prior art references were merely experimental, and involved use of catheters in hospital settings that were not open to the public. That argument fails under the criteria for public use to establish prior art, set out in the early case, *Egbert v. Lippmann,* 104 U.S. (14 Otto) 333, 336, 26 L.Ed. 755 (1881).

[F]irst ... to constitute the public use of [the invention recited in] a patent it is not necessary that more than one of the patented articles should be publicly used. The use of a great number may tend to strengthen the proof of public use, but one well defined case of public use is just as effectual to annul the patent as many.

....

[S]econdly ... whether the use of an invention is public or private, does not necessarily depend upon the number of persons to whom its use is known. If ... used ... without limitation or restriction, or injunction of secrecy, ... such use is public, within the meaning of the statute, even though the use and knowledge of the use may be confined to one person.

[T]hirdly ... some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye. ... Nevertheless, if ... used without restriction of any kind, the use is a public one, within the meaning of the law.

The language "without limitation or restriction, or injunction of secrecy" applies in this suit where all evidence indicates the surgeons using the prior art freely shared with other surgeons their ideas concerning venous return. "As a general principle, any non-secret use of the completed and operative invention or discovery in its natural and intended way is a public use within the meaning of [section 102]." *Bourne v. Jones,* 114 F.Supp. 413, 419, 98 U.S.P.Q. 206, 210 (S.D.Fla.1951), *aff'd by adoption,* 207 F.2d 173, 98 U.S.P.Q. 205 (5th Cir.), *cert. denied,* 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398 (1953). In *Marrese v. Richard's Medical Equip.,* 504 F.2d 479, 183 U.S.P.Q. 517 (7th Cir.1974), the court held that hospital use of a device to prevent anesthetic gases from escaping into an operating room constituted public use, even though the operating room is not open to the public. *See also Electric Storage Battery Co. v. Shimadzu,* 307 U.S. 5, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071, 41 U.S.P.Q. 155 (1939); *Brush v. Condit,* 132 U.S. 39, 10 S.Ct. 1, 33 L.Ed. 251 (1889); *Magnetics, Inc. v. Arnold Engineering Co.,* 438 F.2d 72, 74, 168 U.S.P.Q. 392, 394 (7th Cir.1971) (Public use exists where no attempts are made to hide an invention from visitors); *see In re Smith,* 714 F.2d 1127, 218 U.S.P.Q. 976 (Fed.Cir.1983); *W.L. Gore & Assoc. v. Garlock, Inc.,* 721 F.2d 1540, 1549, 220 U.S.P.Q. 303, 309 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Kardulas v. Florida Machine Products Co.,* 438 F.2d 1118, 1123, 168 U.S.P.Q. 673, 677–78 (5th Cir.1971) ("The courts have generally construed the term 'public use' broadly.... The use may be public where it is exposed to persons other than the inventor, including customers and salesmen, who are under no obligation of secrecy."). The court finds the art brought forth by RMI constitutes prior art under the public use analysis, because the described catheters were used in their natural and intended manner, and were neither secreted nor concealed.

■ 3M contends that regardless of the public use doctrine, Dr. Flege's work and Berryessa's obturator are not prior art because they were not reduced to practice more than one year before Amrine's invention date. The presumed date of invention is the date the patent application was filed, which in the present case was March 18, 1977. *U.S. Expansion Bolt Co. v. Jordan Indus., Inc.,* 488 F.2d 566, 568 n. 3, 180 U.S.P.Q. 161, 162 n. 3, 23 A.L.R.Fed. 316 (3d Cir.1973); *Monaplastics, Inc. v. Caldor, Inc.,* 378 F.2d 20, 21, 153 U.S.P.Q. 826, 827 (2d Cir.1967). To prove an earlier invention date in order to defeat prior art claims, the burden is on 3M to show by clear and convincing evidence the dates on which Amrine both conceived of and reduced to practice his invention. *Id.; Cosden Oil & Chem. Co. v. American Hoechst Corp.,* 543 F.Supp. 522, 535, 214 U.S.P.Q. 244, 254 (D.Del.1982); *Grefco, Inc. v. Ke-*

*wanee Indus., Inc.,* 499 F.Supp. 844, 848, 208 U.S.P.Q. 218, 222–23 (D.Del.1980), *aff'd,* 671 F.2d 495 (3d Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981); *United Shoe Mach. Corp. v. Brooklyn Wood Heel Corp.,* 77 F.2d 263, 264 (2d Cir.1935) ("When an inventor's date of invention is to be carried back beyond his application, courts … must be persuaded with a certainty which is seldom demanded elsewhere.... [T]he burden is the same as the proof necessary to establish a prior use."). "The date of invention cannot be carried back to that of the earliest mental conception. There must be disclosure sufficient to enable one with ordinary skill in the art to reduce the invention to practice." *Kardulas,* 438 F.2d at 1121, 168 U.S.P.Q. at 673 (Patentee showed early date of invention by commissioning a manufacturer and disclosing the invention to her patent attorney.). "[I]t is well-settled that the uncorroborated and undocumented testimony of the patentee is insufficient to prove invention date." *Id.*

▮ 3M endeavors to establish September 25, 1975 as the date on which Amrine conceived of all claims included in the '129 patent, and February 21, 1977 as the date on which he reduced them to practice. However, the court considers self-serving and lacking in credibility, Amrine's undocumented statements concerning the chronology of events and his explanations of documented events that were set forth to establish himself as the inventor of claims 1–4 and 7.

On December 15, 1985, Amrine first communicated his "new product idea" to Robert A. Choate, a patent attorney. Amrine enclosed a drawing that places the catheter in the SVC, and shows no obturator. In the report of his December 4, 1975 visit to Dr. Flege, he mentioned only that Dr. Flege claimed he placed the catheter tip into the IVC. As late as February, 1976, Amrine was still instructing Dr. Flege and others to place the tip in the SVC. There exists no written evidence that Amrine even acknowledged the desirability of placement in the IVC until July 23, 1976 when the Sarns instruction sheets were prepared showing insertion into IVC. That date is well after Dr. Flege's letter to Amrine recounting his two successful operations in which the modified Sarns 51 French was extended into the IVC. Amrine's Cincinnati trip report also mentioned that he did not think the sideholes Dr. Flege added to the Sarns 51 French were the ultimate answer to SVC return. Therefore, Dr. Flege's work constitutes prior art for claims 1 and 3 of the '129 patent.

As stated in the court's discussion of the obturator described in claim 7, no evidence exists to substantiate that Amrine was even aware of the blood loss problem solved by the obturator until after he witnessed surgery performed by Dr. Liddle. Only a few days following the surgery, Berryessa informed Amrine of successful use of the 22 French 5cc Foley catheter as an obturator. Amrine acknowledged by letter to Berryessa that the obturator was Berryessa's idea. The court rejects Amrine's explanation that he was actually stating in his letter that only the use of the Foley catheter as an obturator (rather than the addition of the obturator itself) was Berryessa's idea. The court finds it incredible that Amrine's ignorance of the very need for an obturator was cured in the three or four days between the operation and the time Berryessa told him of Dr. Liddle's success in using the Foley catheter as an obturator. Further, Amrine did not mention an obturator to his patent attorney before Berryessa informed him of its development. In his instructions to the numerous surgeons who were clinical evaluators, he described the following method: "[Insert with] one rapid continuous motion so you don't get bleeding out the sideholes." No mention of the obturator was included in the instructions sent out for clinical use on July 28, 1976.

Accordingly, the court finds 3M failed its burden to establish September 25, 1975 as Amrine's date of invention of claims 1, 2, 3, 4 and 7 of '129 patent. The question of date of invention for determining prior art is not relevant to the Bailey, Chiechi or Fitch references where the court has concluded these are prior art under the public use analysis.

### C. *Inventorship, section 102(g)*

█ Section 102(g) establishes rules for determining inventorship through consideration of such factors as abandonment, suppression and concealment. It also governs the principles of conception and reduction to practice. RMI asserts Dr. Flege is the inventor of claims 1 and 3, and Berryessa is the inventor of claims 2, 4 and 7. Considering the court's determination that Amrine failed to establish September 25, 1975 as the invention date of these claims [14] and the above chronology of events that the court finds to be factual, the court concludes Dr. Flege first conceived of and first reduced to practice claims 1 and 3, and Berryessa first conceived of and first reduced to practice claims 2, 4 and 7. The court finds the evidence clear and convincing that both Dr. Flege and Berryessa took steps to make their inventions public and enrich the art, and finds no evidence of abandonment, suppression or concealment of those inventions.

Thus claims 1, 2, 4 and 7 are invalid for failure to meet the section 102(f) requirement that Amrine himself be their inventor.

### D. *Obviousness, section 103*

█ Under 35 U.S.C. § 103, RMI's burden is to show that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time to a person having ordinary skill in the art to which said subject matter pertains." *In re Keller*, 642 F.2d 413, 425, 208 U.S.P.Q. 871, 881 (C.C.P. A.1981) (The test in determining whether a claimed invention would have been obvious is what the combined teachings of the references would have suggested to one of ordinary skill in the art.) Factors relevant to that test are: (a) the scope and content of prior art; (b) the differences between the prior art and the patented design; and (c) the level of ordinary skill in the art at the time the invention was made. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 556, 148 U.S.P.Q. 459, 467 (1966); *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1441–43, 221 U.S.P.Q. 97, 108 (Fed.Cir.1984). Obviousness is not established by "combining the teachings of prior art to produce the claimed invention, absent some teaching or suggestion that the combination be made." *In re Stencel*, 828 F.2d 751, 4 U.S.P.Q.2d 1071 (Fed.Cir.1987); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143, 227 U.S.P.Q. 543, 551 (Fed.Cir.1985); *In re Corkill*, 771 F.2d 1496, 1501–02, 226 U.S.P. Q. 1005, 1009–10 (Fed.Cir.1985). Secondary considerations such as commercial success, long-felt need and acquiescence are also relevant to the issue of validity. *Graham*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545.

### E. *Presumption of validity and burden of proof*

█ Section 282, 35 U.S.C. creates a presumption that a patent is valid and imposes the burden on the attacker to prove invalidity by clear and convincing evidence.[15] *Hughes Tool Co. v. Dresser Indus., Inc.*, 816 F.2d 1549, 2 U.S.P.Q.2d 1396 (Fed.Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459, 221 U.S. P.Q. 481, 486 (Fed.Cir.1984). That burden

---

14. 3M cites *Amax Fly Ash Corp. v. United States,* to support its argument that Amrine's position as patentee was not jeopardized by his dealings with Dr. Flege and Berryessa because they were merely conducting clinical evaluations and "[o]nce conception has occurred, the inventor may use the services and assistance of others to perfect his invention without losing his right to patent." 206 Ct.Cl. 756, 514 F.2d 1041, 1047, 185 U.S.P.Q. 437 (1975). However, *Amax* is inapposite here in light of Amrine's failure to prove he first conceived of. Dr. Flege's and Berryessa's contributions.

15. Section 282, 35 U.S.C. provides:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing validity of a patent shall rest on the party asserting invalidity.

remains upon the party asserting invalidity until final decision. *Jones v. Hardy,* 727 F.2d 1524, 220 U.S.P.Q. 1021 (Fed.Cir.1984) "Introduction of more pertinent art than that considered by the examiner does not ... weaken or destroy the presumption. Nor does such introduction 'shift' the basic burden of persuasion.... Such introduction can, of course, facilitate the challenger's carrying of that burden." *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534, 218 U.S.P.Q. 871, 875–76 (Fed.Cir. 1983). "[The effect] of new prior art [not before the PTO] ... is to eliminate or at least reduce, the element of deference due the PTO, thereby partially, if not wholly, discharging the attacker's burden...." *Kimberly–Clark v. Johnson & Johnson,* 745 F.2d 1437, 1443, 223 U.S.P.Q. 603, 606 (Fed.Cir.1984) (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1358–60, 220 U.S.P.Q. 763, 770–71 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984)); *see also EWP Corp. v. Reliance Universal, Inc.,* 755 F.2d 898, 905, 225 U.S.P.Q. 20, 24 (Fed. Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985) (When no PTO view on obviousness is before the court, the patent challenger's burden of proof under 35 U.S.C. § 282 is more easily carried.) The introduction of more pertinent prior art requires the party supporting validity to come forward with countervailing evidence. *Stratoflex,* 713 F.2d at 1534, 218 U.S.P.Q. at 875–76. "In the end, the question is whether *all* the evidence establishes that the validity challenger so carried his burden as to have persuaded the decision maker that the patent can no longer be accepted as valid." *Id.* (emphasis in original).

#### F. *Scope and content of prior art*

"The scope of the prior art has been defined as that 'reasonably pertinent to the particular problem with which the inventor was involved.'" *Stratoflex,* 713 F.2d at 1535, 218 U.S.P.Q. at 876 (quoting *In re Wood,* 599 F.2d 1032, 1036, 202 U.S.P.Q. 171, 174 (C.C.P.A.1979)); *see Weather Engineering Corp. of America v. United States,* 614 F.2d 281, 222 Ct.Cl. 322, 208 U.S.P.Q. 939 (1980). The problems confronting Amrine were primarily related to blood flow obstruction and loss of blood on insertion of the catheter during cardiovascular surgery. Dr. Bailey testified that the relevant prior art is the art of venous return, and the court accepts that definition for purposes of this opinion.

The content of the prior art is set out above in the court's discussion of the asserted prior art.

#### G. *Differences between the prior art and the '129 patent*

■ In considering the validity of design patents, the patented design as a whole must be compared with what is disclosed by the prior art as a whole. *Hartness Int., Inc. v. Simplimatic Eng. Co.,* 819 F.2d 1100, 1108, 2 U.S.P.Q.2d 1826, 1832 (Fed. Cir.1987); *In re Sernaker,* 702 F.2d 989, 996, 217 U.S.P.Q. 1, 7 (Fed.Cir.1983).

The court begins its comparison by finding that no difference exists between method claims 1–4 of the '129 patent and the methods described in prior art. The evidence is abundant that Dr. Chiechi and Dr. Flege used method claims 1 and 3 by inserting a two-stage venous return catheter into the right atrium of the heart and extending the catheter into the IVC. The placement allows drainage from IVC through holes in the lead tip, and drainage from the atrium through the secondary holes located mid-catheter. Indeed, in a notation he made on a draft of his application, Amrine admitted that "[t]he insertion procedure, Figs. 6, 7, 8, 9 are quite commonly used and might even be considered traditional or standard." Defendant's Exhibit (DX) A14.

Apparatus claims 5–7 of the '129 patent describe the Amrine catheter. Claim 5 contains the structural components of the first-diameter tube with elongated slots in the rounded nose portion on the insertion end, a second-diameter tube and a slotted juncture between the tubes to admit fluid at the catheter's mid-point. Claim 6, dependent on claim 5, adds the limitation that the slotted juncture be tapered. Claim 7 is

an independent claim that adds the removable obturator.

Examining the differences between the Amrine catheter and the catheters used by Dr. Bailey, the court observes that although it did not involve two tubes of different diameters, one early model of Dr. Bailey's catheter was a single tube, small diameter at the insertion point and gradually tapering to large diameter. Side holes were punched to allow drainage from the coronary sinus, SVC and IVC. The catheter did not include an apertured juncture.

Dr. Flege's single-diameter two-stage catheter was constructed from a Sarns 51 French catheter into which Flege had punched side holes. Its lead tip is identical, except in size, to the tip on the Sarns two-stage catheter. The side holes allow drainage from the right atrium while the slotted tip is inserted into the IVC. Dr. Flege's modified Sarns contains round secondary drainage openings (made with a leather punch) in lieu of the elongated slots in the Sarns two-stage catheter; however, an earlier Flege model used oval drainage openings.

Most nearly identical to Amrine's device described in the '129 patent is the catheter Dr. Chiechi developed by inserting a small-diameter tube into a large-diameter tube, then punching holes in the lead tip and directly below the juncture. The sole difference of any significance between the Chiechi catheter and the Amrine catheter is that the Amrine junction is tapered, and the slots are in rather than below the junction. However, Dr. Bailey testified Dr. Chiechi often whittled with a knife or scissors the junction area to provide a smooth transition between the small-diameter and large diameter tubes. The court considers the difference that results from Dr. Chiechi's placement of the secondary openings below rather than in the tapered junction merely one of logistics. For Dr. Chiechi to have punched holes through both tubes at the juncture in his handmade catheter would have been extremely difficult. The placement of the slots in the junction was easily accomplished when the Amrine catheter was produced. However, speculation as to how Dr. Chiechi would have designed a commercially produced catheter is not vital to this discussion of differences where both the Chiechi and Amrine secondary holes provide the same function, that is, they facilitate drainage from the right atrium while the holes in the tip facilitate drainage from the IVC.

Concerning claim 7 of the '129 patent that adds the obturator, the court finds that the Amrine obturator differs from the Berryessa obturator in that it is a rod rather than another catheter, but that improvement would be obvious to anyone seeking to produce the obturator commercially. The primary difference between the Fitch reference obturator and the Amrine obturator lies in the material used for production. The court considers these differences insignificant.

### H. Level of ordinary skill in the art

■ The factors for determining level of ordinary skill in the art are: (a) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 696, 218 U.S.P.Q. 865, 868 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed. 2d 173 (1984); *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82, 217 U.S.P.Q. 1281, 1285 (Fed.Cir.1983).

> Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. The important consideration lies in the need to adhere to the statute, *i.e.*, to hold that an invention would or would not have been obvious, as a whole to a person of 'ordinary skill in the art'—not to the judge, or to a layman when it was made, or to those skilled in remote arts, or to geniuses in the art at hand.

*Environmental Designs*, 713 F.2d at 697, 218 U.S.P.Q. at 868–69.

Dr. Bailey testified that one of ordinary skill in the art would be a doctor who had undergone a two-year residency in thoracic or cardiovascular surgery. 3M counters that a person of ordinary skill in the art would be a surgeon, a perfusionist, a person trained in heart surgery, a medical products designer, a person self-trained by reading related literature for years or a person who has actually been in a operating room and seen a large number of operations.

Noting the complexity of open heart surgery and the myriad unforeseen problems that can occur in any operation, the fact that all prior art solutions have been developed by surgeons and their perfusionists, the fairly rapid progress (matching the rise in open heart surgery) toward development of an apparatus having the sophistication of the two-stage catheter, the court concludes a person of ordinary skill in the art would be a cardiovascular surgeon of at least two years experience in the operating room. The court's conclusion is underscored by Amrine's repeated testimony that he is not a cardiac surgeon, and is not qualified to discuss the intricacies of the heart's anatomy or cardiac surgery.

▆ Therefore, this court must determine what would have been obvious to a cardiovascular surgeon of at least two years experience in the operating room who had knowledge of all prior art as of March 18, 1977, the found date of invention of the Amrine catheter. *Kimberly–Clark,* 745 F.2d at 1452–53, 223 U.S.P.Q. at 614. Section 103 requires the court to

> presume full knowledge by the inventor of the *prior* art *in the field of his endeavor,* ... and it requires [the court] to presume that the inventor would have [the] ability to select and utilize knowledge ... pertinent to his particular problem which would be expected of a man of *ordinary skill in the art* to which the subject matter pertains.

*Id.,* 745 F.2d at 1452, 223 U.S.P.Q. at 613 (emphasis in original) (quoting *In re Antle,* 444 F.2d 1168, 1171–72, 170 U.S.P.Q. 285, 287–88 (C.C.P.A.1971)). That art would include the Bailey catheter, the Chiechi catheter and the Flege modified Sarns catheter, with instructions on the method of insertion through the right atrium and placement of the lead tip in the IVC. The art would also include the Berryessa obturator and instructions for its use. The court agrees with Dr. Bailey's opinion that a surgeon of ordinary skill in the art of venous return would be able to select from the prior art the solutions to the problems inherent in venous drainage. Amrine's primary service was to act as a mechanic or draftsman in the preparation for commercial production of the two-stage venous return catheter described in the '129 patent. The development of the '129 patent required no exercise of invention on Amrine's part. *See Amer. Infra–Red Radiant Co. v. Lambert Indus., Inc.,* 360 F.2d 977, 979, 149 U.S.P.Q. 722, 726 (8th Cir.), *cert. denied,* 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

The court concludes RMI carried its burden to prove, by clear and convincing evidence, that the '129 patent is invalid. Differences between the Amrine two-stage catheter and the prior art are such that the subject matter as a whole would have been obvious to a person of ordinary skill in the art of venous return at the time the patent application was filed.

## I. *Secondary considerations*

In *Graham,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, the Supreme Court discussed what are known as "secondary considerations" to the "circumstances surrounding the origin of the [patented] subject matter" which the Supreme Court has said might have relevancy in determining the obviousness of a claimed invention. Secondary considerations relevant to this case include: commercial success, long-felt need, commercial acquiescence and near simultaneous invention.

### 1. Commercial success

▆ Commercial success is considered relevant to lack of obviousness on the rationale that competitors would have been economically motivated to make the invention sooner if it had been truly obvious. *Fromson v. Advance Offset Plate, Inc.,* 755 F.2d

1549, 1557, 225 U.S.P.Q. 26, 32 (Fed.Cir. 1985); *Simmons Fastener Corp. v. Illinois Tool Works,* 739 F.2d 1573, 1576, 222 U.S.P.Q. 744, 746 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2136, 85 L.Ed.2d 496 (1985).

> [F]or commercial success of a product embodying a claimed invention to have true relevance to the issue of nonobviousness, that success must be shown to have in some way been due to the nature of the claimed invention, as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter.

*Cable Elec. Prod., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1027, 226 U.S.P.Q. 881, 888 (Fed.Cir.1985); *Simmons Fastener,* 739 F.2d at 1575, 222 U.S.P.Q. 746–47. ("[A] nexus between the [technical] merits of the claimed invention and the evidence of secondary considerations is required in order for the evidence to be given substantial significance in an obviousness decision."); *Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309, 315, 227 U.S.P.Q. 766, 770 (Fed.Cir.1985). "[W]hen explanations other than invention are brought forth to indicate reasons for the commercial success, the evidentiary weight of this factor is all but destroyed." *Amer. Infra–Red,* 360 F.2d at 989–90, 149 U.S.P.Q. at 722.

▮▮▮ 3M presented as evidence a graph showing the sales of the Amrine two-stage catheter since its introduction in 1977. By 1983, the combined sales of the Amrine catheter by Sarns, and its licensee Bard, had reached more than 190,000 annually; exceeding by several times the sales of Sarns' caval and single atrial cannulae. Hammond, president of Sarns, testified the increase in sales required no greater advertising than did the other catheters in the Sarns line.

RMI counters that a mere display of sales figures without additional data reflecting the state of the market, the benefits of advertising and other factors that could contribute to a sales increase are not probative of obviousness. *See, e.g., Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151, 219 U.S.P.Q. 857, 861 (Fed.Cir.1983);

*Nickola v. Peterson,* 580 F.2d 898, 914, 198 U.S.P.Q. 385, 402 (6th Cir.1978), *cert. denied,* 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979). Specifically, RMI points out that Amrine admitted surgical procedures of the type most benefited by two-stage venous return catheters began to be widespread only around the time of Amrine's alleged invention. "If the machine or composition appear shortly after some obstacle to its creation, technical or economic, has been removed, [the courts] should scrutinize its success jealously." *Ruben Condenser Co. v. Aerovox Corp.,* 77 F.2d 266, 268 (2d Cir.), *cert. denied,* 296 U.S. 623, 56 S.Ct. 145, 80 L.Ed. 443 (1935). Where 3M offered no evidence related to the effect of the rise and innovations in cardiac surgery on the sales of the Amrine catheter, the court agrees with RMI that the weight of 3M's evidence is lessened by its failure to address market conditions either through examining the movements in cardiac surgery or comparing Sarns' sales to competitors' sales under the various factors affecting sales.

RMI further contends the commercial success of the Amrine catheter should be discounted as not completely relevant to its technical merits, but rather to 3M's advertising prowess, because sales of the Amrine catheter were relatively low until 3M doubled the sales force in 1981 when the company took over Sarns and the '129 patent. "Commercial success due only to superior business acumen, or effective advertising, is of no relevance to a determination of whether the invention would have been obvious under 35 U.S.C. § 103." *Solder Removal Co. v. United States Int'l Trade Comm'n,* 582 F.2d 628, 637, 199 U.S.P.Q. 129, 137 (C.C.P.A.1978). The court agrees that 3M's failure to show the advertising expenses involved in promoting the '129 patent further diminishes the weight to be given 3M's evidence concerning commercial success.

Finally, RMI claims that whatever success 3M has experienced with the Amrine catheter can be attributed largely to the fact that the catheter is disposable. However, that feature is not claimed in the '129 patent; therefore, sales attributed to the

disposability must be disregarded. *See Pentec, Inc.*, 776 F.2d at 316, 227 U.S.P.Q. 766.

Upon review of the evidence 3M presented, the court is persuaded that commercial success here might have been due in large part to "other economic and commercial factors unrelated to the technical quality of the patented subject matter." *Cable Elec.*, 770 F.2d at 1027, 226 U.S.P.Q. at 888.

### 2. Long-felt need

The essence of 3M's argument here is that where the problems of blood obstruction during dual cannulation were well-recognized by surgeons in 1975, the invention could not have been obvious or the long-felt need would not have existed, waiting for Amrine to fill it. However, the court agrees that in light of the numerous surgeries conducted with handmade versions of the Amrine catheter, the long-felt need was for production rather than invention of a two-stage catheter.

### 3. Commercial acquiescence—Licensing

■ Acquiescence in a patent's validity by those having motivation and resources to challenge it is further evidence that the patented inventions would not have been obvious. It is reasoned that if an invention were vulnerable to an attack based on obviousness, competitors would challenge the patent rather than acquiesce. *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1448, 221 U.S.P.Q. 385, 391 (Fed. Cir.), *cert. denied sub. nom., Hazeltine Corp. v. RCA Corp.*, 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984).

3M points out that all potential competitors, except RMI, have respected the Amrine patent when it was brought to their attention: C.R. Bard took a license rather than fighting the patent; Shiely Company restricted its sales to overseas where 3M does not have a patent; Sherwood Medical abandoned its plans to produce a two-stage catheter; and Von Berg entered a consent judgment with 3M in this litigation. In the case of C.R. Bard, the company found it less costly to take a license than to challenge the validity of the patent, although evidence was presented to show C.R. Bard considered the '129 patent invalid because

the alleged "invention" resulted from Amrine's taking his ideas from the various surgeons with whom he spoke. Although Von Berg took a consent judgment, there is evidence it followed the most economically realistic route because it sold its business, and no longer had a stake in the outcome of this litigation. In sum, 3M failed to demonstrate that the competitors' acquiescence resulted from respect for the '129 patent rather than fear of protracted litigation with 3M. Moreover, no showing of commercial success of the '129 patent is sufficient to rebut RMI's showing with prior art evidence that the Amrine catheter would have been obvious. *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 227 U.S.P.Q. 838 (Fed.Cir.1985).

### 4. Near simultaneous invention

The sole secondary consideration asserted by RMI is that related to the widespread, independent and simultaneous prior discovery of the claimed invention by other workers in the patent field, that is, the surgeons who developed their own catheters. The court finds most compelling the evidence presented under this secondary consideration because the nexus between simultaneous invention and obviousness is apparent: it is difficult to understand how unrelated surgeons could develop two-stage catheters similar to the Amrine catheter unless that development was obvious from known surgical methods. Just as evidence of nonobviousness may be inferred from the failure of others to find a solution to a problem, evidence of obviousness can be inferred from the success of others. *Ceco Corp. v. Bliss & Laughlin Indus., Inc.*, 557 F.2d 687, 690, 195 U.S.P.Q. 337, 339 (9th Cir.1977); *Reeves Bros., Inc. v. U.S. Laminating Corp.*, 417 F.2d 869, 872, 163 U.S.P.Q. 577, 579 (2d Cir.1969).

■ Based on its findings related to prior art, the court determines that the widespread independent development of the two-stage venous return catheter and its insertion through the right atrium into the IVC to drain both locations demonstrates that the technology claimed in the '129 patent was obvious to surgeons faced with

the problem of inadequate venous drainage while accessing the back of the heart.

Finally, although secondary considerations can have some relevance on the issue of obviousness where a proper nexus is shown between the evidence and the inference to be urged from that evidence, no amount of secondary evidence can prevent the invalidation of a patent in view of the prior art. *Datascope Corp. v. SMEC, Inc.,* 776 F.2d 320, 327, 227 U.S.P.Q. 838, 843 (Fed.Cir.1985). Examination of these secondary considerations against the backdrop of the prior art asserted does not move the court from its decision that the '129 patent is invalid as being obvious to one ordinarily skilled in the art of venous return. No subsequent actions by 3M, or its competitors, can overcome the clear and convincing evidence that Amrine did not invent the '129 patent and that the apparatus described in the patent would have been obvious, in March, 1977, to one of ordinary skill in the art of venous return.

### V. UNENFORCEABILITY OF THE '129 PATENT—INEQUITABLE CONDUCT

■ "The defense of inequitable conduct requires proof of: (1) an act of misrepresentation, (2) which was material, (3) involving information that was known or should have been known to the patentee, and (4) which was committed with the requisite intent." *N.V. Akzo v. E.I. DuPont de Nemours,* 810 F.2d 1148, 1153, 1 U.S.P.Q.2d 1704, 1708 (Fed.Cir.1987); *Environmental Designs,* 713 F.2d 693, 218 U.S.P.Q. 865; *see also J.P. Stevens & Co. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 223 U.S.P.Q. 1089 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). The party asserting inequitable conduct bears a heavy burden of proof which must be met by clear and convincing evidence. *Environmental Designs,* 713 F.2d at 698, 218 U.S.P.Q. at 870; *Nelson v. Bowler,* 626 F.2d 853, 858, 206 U.S.P.Q. 881, 885 (C.C.P.A.1980); *Norton v. Curtiss,* 433 F.2d 779, 797, 167 U.S.P.Q. 532, 546–47 (C.C.P.A. 1970). If the patent challenger should carry the burden, the patent is unenforceable. *Korody–Colyer Corp. v. General Motors Corp.,* 760 F.2d 1293, 225 U.S.P.Q. 1099 (Fed.Cir.1985).

■ The defense of inequitable conduct may arise when a patent applicant withholds information from the PTO. The applicant bears a duty of absolute candor which is not defined in terms of what he *knew* to be anticipation or near anticipation of the invention claimed, but rather what he knows to be "relevant, material prior art." *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.,* 759 F.2d 10, 13, 225 U.S.P.Q. 1100, 1103 (Fed.Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985) (quoting *In re Clark,* 522 F.2d 623, 627, 187 U.S.P.Q. 209, 212 (C.C.P.A.1975) ("The duty to disclose relevant, material prior art ... known to the applicant or his agents and not found by the examiner, is well established."); *accord, Driscoll v. Cebalo,* 731 F.2d 878, 884–85, 221 U.S.P.Q. 745, 750 (Fed.Cir.1984). "In patent cases, 'materiality' has generally been interpreted to mean that if the Patent Office had been aware of the complete or true facts, the challenged claims would not have been allowed." *Argus Chemical,* 759 F.2d at 14, 225 U.S.P.Q. at 1103 (quoting *Norton,* 433 F.2d at 794, 167 U.S.P.Q. at 544). The *Argus Chemical* court discussed the tests for materiality as set out in the 1984 decision, *J.P. Stevens:*

'Inequitable conduct' requires proof by clear, convincing evidence of a threshold degree of materiality of the nondisclosed or false information. It has been indicated that the threshold can be established by any of four tests: (1) objective 'but for'; (2) subjective 'but for'; (3) 'but it might have been'; and (4) PTO Rule 1.56(a), i.e., whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. *American Hoist,* 725 F.2d at 1362, 220 U.S.P.Q. at 773....

*Argus Chemical,* 759 F.2d at 14, 225 U.S.P.Q. at 1103 (quoting *J.P. Stevens,* 747 F.2d at 1559, 223 U.S.P.Q. 1089 (at?) (Fed. Cir.1984)). *Argus* further quoted *J.P. Ste-*

*vens* as stating: " '[T]hreshold intent is established where an actor in an applicant's position would have reasonably known that the reference was material, *e.g.*, that the reference would have been important to a reasonable examiner in deciding whether to allow the claims.' " *Argus Chemical*, 759 F.2d at 14, 225 U.S.P.Q. at 1100 (quoting *J.P. Stevens*, 747 F.2d at 1564, 223 U.S.P.Q. at 1096).

The issue of intent is discussed fully in *J.P. Stevens*.

'Inequitable conduct' also requires proof of threshold intent. That intent need not be proven with direct evidence. [*Hycor Corp. v. The Schlueter Co.*, 740 F.2d 1529, 1540, 222 U.S.P.Q. 553, 561 (Fed.Cir.1984) ]. It may be proven by showing acts the natural consequence of which are presumably intended by the actor. *American Hoist*, 725 F.2d at 1363, 220 U.S.P.Q. at 773; *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151, 219 U.S.P.Q. 857, 862 (Fed.Cir.1983). Proof of deliberate scheming is not needed; gross negligence is sufficient. *Hycor*, 740 F.2d at 1540, 222 U.S.P.Q. at 561. Gross negligence is present when the actor, judged a reasonable person in his position, should have known of the materiality of a withheld reference. *Driscoll v. Cabello*, 731 F.2d at 885, 221 U.S.P.Q. at 751; *Kansas Jack, Inc. v. Kuhn*, 719 F.2d at 1152, 219 U.S.P.Q. at 862. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. *Orthopedic Equip. Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383, 217 U.S.P.Q. 1281, 1286 (Fed. Cir.1983).

Once the threshold of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred. *American Hoist*, 725 F.2d at 1364, 220 U.S.P.Q. at 774. If the court reaches that conclusion, it must hold that the patent claims at issue are unenforceable.

747 F.2d at 1560, 225 U.S.P.Q. at 1092; *see also N.V. Akzo*, 810 F.2d at 1153, 1 U.S.P. Q.2d at 1708–9.

In *Korody–Colyer*, the Federal Circuit Court affirmed the district court's decision that the patentee engaged in inequitable conduct. 760 F.2d at 1294, 225 U.S.P.Q. at 1104. The court reached its conclusion after making affirmative findings under the following inquiries: (1) whether the applicant was fully aware of certain prior art, and of its materiality, before and during prosecution; (2) whether a reasonable examiner would have considered that art important in determining whether to allow the application to issue as a patent; (3) whether the applicant disclosed that art to the PTO; (4) whether the applicant made disclosures in correspondence that related to his understanding of the materiality of the art; (5) whether the nondisclosed prior art references were more pertinent than those considered by the examiner during prosecution; and (6) whether the failure to disclose the art, if not deliberate concealment, was at the very least a calculated recklessness with regard to the truth. The district court also concluded that the "nondisclosure was a 'substantial cause' and 'crucial factor' in obtaining the patent and that it showed a 'culpable state of mind.' " *Id.* 760 F.2d at 1294–95, 225 U.S.P.Q. at 1100; *see Argus Chemical*, 759 F.2d at 14, 225 U.S.P.Q. at 1103.

In his application for the '129 patent, Amrine cited as prior art a Sarns patent, a Krieselman patent, a Seiler patent and an article known as the "Maraist reference." The court's examination of the prior art revealed in the '129 patent application shows the examiner was not presented with a single patent or reference that taught dual drainage using a single catheter inserted through the right atrium with the tip resting in the IVC. The Sarns patent teaches placement of one catheter in the SVC and another in the IVC; it does not teach drainage from the right atrium or use of a multiple drainage hole. The Krieselman patent describes a large-diameter, small-diameter tube and tapered junction, but no holes in the lead tip or apertured juncture. Moreover, the diagram of the apparatus shows oral insertion; it is an insufflation apparatus not intended for use as a venous return catheter. The Seiler

patent describes a tubular cutting instrument to be used in vitreous surgery. The Maraist reference, considered the most important by the patent examiner, teaches placement of one tube through the IVC and SVC, and another in the right atrial appendage down through the tricuspid valve into the right ventricle. The tube draining from the IVC and SVC is tied off at two points so drainage occurs only in the IVC and SVC, and there are no holes to allow drainage from the right atrium. As stated in the prosecution history section of this opinion, the patent examiner originally concluded claims 1–6 of the '129 patent failed to distinguish over the Maraist reference, and allowed claim 7 only.

The court's review of the prior art asserted by RMI convinces it that the works of Dr. Bailey, Dr. Chiechi, Dr. Flege, Berryessa and the Fitch reference, all related to single catheter drainage or use of an obturator, are highly relevant and material prior art that should have been disclosed to the patent examiner. Examination of the facts in light of the *Korody–Colyer* first reveals that regardless of Amrine's knowledge of Dr. Bailey's and Dr. Chiechi's work, he was fully aware of Dr. Flege's two-stage catheter and that it was inserted into the IVC. Further, no evidence was presented to indicate Amrine even believed an obturator was necessary until after Berryessa suggested it. There can be no question of the materiality of these references. Second, where the examiner of the '129 patent originally disallowed claims 1 through 6 for failure to distinguish over the Maraist reference which involved drainage by use of two catheters and employing different method claims, undoubtedly, a reasonable examiner would have considered important any art related to a single two-stage catheter inserted in the manner described in claims 1–4 of the '129 patent. Third, shortly after adding use of a Foley catheter as an obturator to his method instructions, Amrine wrote Berryessa a letter acknowledging the obturator was Berryessa's idea. He also noted in a margination on his patent application that the method claims are old. Fourth, the non-disclosed references are clearly more pertinent than those considered by the patent examiner during prosecution. Amrine's arguments to the patent examiner's initial disallowance of claims 1–6 fail when applied to the non-disclosed prior art. The Amrine catheter is merely a commercial version of Dr. Chiechi's handmade catheter, notwithstanding Amrine's addition of an apertured junction, a feature that would have been difficult, if not impossible, to create in the handmade model that involved the close fitting of a small tube into a larger one. Dr. Flege's use of a two-stage catheter by the method described in claims 1–4 of the '129 patent is more pertinent than the Maraist reference describing dual cannulation employing a different method of insertion. The only claim originally allowed was claim 7, describing the obturator, on which Amrine disclosed no prior art. Clearly, a reasonable patent examiner would consider the work of Berryessa and the Fitch reference pertinent to an evaluation of claim 7. Fifth, while the court believes sufficient evidence exists to conclude Amrine deliberately concealed the non-disclosed prior art, particularly that involving Dr. Flege and Berryessa, it is clear the concealment was, at the very least a calculated recklessness with regard to the truth. It appears to the court that Amrine's talent lay not in invention, but rather, in adding to his own device the inventions of others as rapidly as possible after they shared their information with him.

Accordingly, the court concludes the '129 patent is unenforceable because Amrine's failure to disclose the asserted prior art constitutes inequitable conduct.

## VI. INFRINGEMENT

■ An invalid patent cannot be infringed. *See Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 220 U.S.P.Q. 193 (Fed. Cir.1983). However, if, as here, the trial court should conclude a patent claim is invalid, it is better practice to consider infringement issues rather than to terminate its analysis after deciding validity issues. In *Stratoflex,* 713 F.2d at 1540–41, 218 U.S.P.Q. at 880, the Federal Circuit discussed the reasons for this practice.

When presented with patent validity and infringement issues, trial courts should ... decide both. First, the parties, witnesses and exhibits involved in both issues are before the court. If a judgment limited to an issue is reversed, it may become necessary to again call many of the same persons before the court for trial or argument on the other. In any event, a remand would normally be necessary for a return by the trial court to whatever fact finding process may be involved in a determination of the undecided issue. Second, a finding that a claimed invention has or has not been appropriated by the alleged infringer may carry substantial weight in a court's analysis of *all* the evidence bearing on the obvious-nonobvious issue.

(Emphasis in original); *Lindemann Maschinenfabrik,* 730 F.2d 1452, 221 U.S.P.Q. 489–90; *see also I.U. Technology Corp. v. Research–Cotrell, Inc.,* 641 F.2d 298, 301, 209 U.S.P.Q. 545, 548 (5th Cir.1981) (Trial court held patent invalid and infringed; appeals court affirmed former and vacated latter). The court will now turn to the infringement issues.

 For 3M to show that the '129 patent apparatus claims 5 and 6 are infringed by the RMI/Von Berg catheters, it is necessary for it to establish, for at least one of its claims, that each element of the claim has a counterpart in the accused RMI/Von Berg two-stage venous return catheter.[16] 3M bears the burden of proof on infringement by the civil standard of preponderance of the evidence. *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 227 U.S.P.Q. 577 (Fed.Cir.1985); *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 221 U.S.P.Q. 473 (Fed.Cir.1984); *SSIH Equip. S.A. v. United States Int'l Trade Comm'n,* 718 F.2d 365, 218 U.S.P.Q. 678 (Fed.Cir.1983).

### A. *Literal infringement*

" 'Literal infringement requires that the accused device embody every element of the claim.' " *Townsend Eng'g v. HiTec Co., Ltd.,* 829 F.2d 1086, 1090, 4 U.S.P.Q.2d 1136, 1139 (quoting *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.,* 757 F.2d 255, 257, 225 U.S.P.Q. 240, 241 (Fed.Cir.1985)). Before it is possible to make a determination of infringement, it is necessary to construe the scope of the claims. *Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.,* 750 F.2d 1569, 1579, 224 U.S.P.Q. 409, 415 (Fed.Cir.1984). This is accomplished by reference to the patent specification, the prosecution history and the prior art, and without reference to the accused device. *SRI Int'l,* 775 F.2d at 1121, 227 U.S.P.Q. at 583. Only after the court determines the scope of the relevant claims is a comparison made to the accused device. *Id.*

RMI concedes the Von Berg catheter literally infringes the '129 patent. However, it asserts that because the Polaris catheter does not embody every element of claims 5 and 6 of the '129 patent, 3M there fails to carry its burden on the literal infringement issue.

The court considers the language of claims 5 and 6 clear and unambiguous as required under 35 U.S.C. § 112. Claim 5 describes the Sarns two-stage venous return catheter as being comprised of a small first-diameter tube with a rounded nose on the insertion end that has circumferentially spaced elongated slots on the sides to admit fluid. The small first-diameter tube is connected to a larger second-diameter tube by a molded reducer known as the "juncture," that contains elongated slots to admit fluid into the enlarged portion.[17] Claim 6 is dependent on claim 5 as it merely

**16.** At trial, a dispute arose concerning whether claim 7 describing use of the obturator is independently patentable. The court does not feel it has sufficient evidence to rule on the independence of claim 7, and will omit claim 7 from its infringement analysis.

**17.** The parties adduced substantial evidence and argument from the seeming inability of the experts to agree upon a definition of the word "juncture" in claims 5 and 6 of the '129 patent. The court finds the juncture is the tapered portion of the catheter that connects the small-diameter tube to the large-diameter tube regardless of whether the bore is unitary or constructed from two tubes with a molded reducer.

provides that the slotted juncture should taper gradually from the small first-diameter tube to the large second-diameter tube.

■ One difference between the Polaris catheter and the Amrine catheter is that the small-diameter tube tapers into the large-diameter tube without the benefit of a molded reducer piece. That is, the Polaris catheter is of unitary construction while the Amrine catheter is made from two separate pieces, the small-diameter tube and the large-diameter tube, held together by a third piece, a glued-in molded, apertured junction. Another difference is that the Polaris catheter's secondary openings are located directly above the tapered portion or juncture, in the flat area of the large-diameter tube, while the Amrine catheter's secondary openings are located in the apertured juncture. Further, the Polaris catheter contains a "reinforcement collar" at the location of the secondary drainage openings that is designed to prevent kinking when the heart is manipulated; the Amrine catheter has no such reinforcement. The court considers these differences sufficiently material to find the Polaris catheter does not literally infringe claims 5 and 6 of the '129 patent. Based on its finding no literal infringement, the court need not discuss RMI's arguments regarding the "reverse order of equivalents doctrine."

### B. *Doctrine of Equivalents*

■ Under the doctrine of equivalents, an accused product, that does not literally infringe a structural claim, may infringe "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 331 (1950) (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 12–13, 74 L.Ed. 147 (1929)); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361, 219 U.S.P.Q. 473, 480 (Fed. Cir.1983); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 961, 220 U.S.P.Q. 592, 600 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). However, the doctrine of equivalents is restricted by prosecution history estoppel, which " 'limits a patentee's reliance on the doctrine of equivalents by preventing him from contending later in an infringement action that his claims should be interpreted as if limitations added by amendment were not present....' " *Townsend Eng'g*, 829 F.2d at 1090, 4 U.S.P.Q.2d at 1139 (quoting *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1579, 220 U.S.P.Q. 1, 6 (Fed. Cir.1983)). "Prosecution history estoppel applies both to claim amendments to overcome rejections based on prior art, and to arguments to obtain the patent." *Hughes Aircraft*, 717 F.2d at 1362, 219 U.S.P.Q. at 481.

RMI argues that the doctrine of prosecution history estoppel is important here because the Polaris catheter deviates from claims 5 and 6 of the Amrine patent at the very point of alleged novelty argued before the PTO during prosecution. The patent examiner initially rejected claims 5 and 6 as failing to patentably distinguish over the cited prior art references. The examiner took the position that the Maraist publication showed a conventional caval catheter, and that it would have been obvious to modify that tube to have two different diameters in the manner of the Kreiselman patent.

Amrine responded to this rejection by distinguishing the language of the claims from the content of Maraist and Kreiselman:

Reference R [Maraist] shows a single diameter cannula while Kreiselman shows an insufflation catheter with a small diameter tip....

Applicant provides and claims a double diameter catheter with a definite purpose. The first and smaller portion picks up the flow from the inferior vena cava while the second enlarged portion can pick up the flow from the right atrium. Because of the apertured juncture, the secondary flow can enter the flow from the smaller lead portion with the least amount of turbulence and the enlarged portion will accept then the combined flow with the merged volumes.

Neither reference R [Maraist] nor Kreiselman disclose or suggest a structure of this kind which will function in this way....

RMI contends that Amrine's use of the terms "definite purpose" using an "apertured juncture" creates a prosecution history estoppel because in order for Amrine to obtain his patent, he argued that he had an apertured juncture with a definite purpose which is to permit fluid to enter it in such a way that turbulence would be minimized. The essence of RMI's contention is that Amrine's argument to the patent examiner so limited claim 5 to placement of the elongated slots in the apertured junction, that the Polaris catheter (on which the slots are not in the apertured junction, but rather, above the junction on the flat area of the large-diameter tube) does not infringe the '129 patent. RMI further sets forth Dr. Hutchings' testimony that the Amrine catheter has advantages over the Polaris catheter because the "pillars" or "struts" in the apertured juncture separate the heart wall from the secondary drainage openings during drainage. RMI's unitary catheter lacks the function of the struts because the holes are on the flat portion of the large-diameter tube. Hutchings also testified the Amrine catheter is preferable to the Polaris catheter because blood flows directly into the Amrine catheter, while blood must turn the corner in the Polaris catheter to flow into secondary drainage openings.

■ The court does not accept RMI's position that Amrine's argument to the patent examiner limited the scope of claims 5 and 6 of the '129 patent to placement of the elongated slots directly in the juncture. A full reading of Amrine's argument shows the "definite purpose" language relates back to the double diameter catheter, not exclusively to the apertured juncture. The "definite purpose" of the double diameter catheter is to allow the "first and smaller portion" to pick up the flow from the IVC while the "second enlarged portion" picks up the flow from the right atrium. The purpose is accomplished as the "secondary flow [enters] the flow from the smaller

lead portion with the least amount of turbulence," and the enlarged portion accepts the combined flow. Amrine did not amend his claims to avoid a prior art reference by insertion of a structural limitation; he merely emphasized and explicated the existing differences, which were substantial, between his invention and the Maraist and Kreiselman references. If this court were to accept RMI's prosecution history estoppel argument, it would permit any catheter that performs substantially the same function in substantially the same way with the same result as the Amrine catheter to escape infringement merely because the elongated secondary slots are not placed directly in the juncture between the small-diameter and large-diameter tubes. Therefore, the court finds nothing in Amrine's prosecution history to obviate the court's analysis of the infringement issues under the test for equivalency articulated in *Graver Tank*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 U.S.P.Q. 328.

■ The court finds that the Polaris catheter performs substantially the same function as the Amrine catheter: simultaneous drainage from the vena cava and the atrium. The simultaneous drainage is accomplished in substantially the same way: the small-diameter tube with slotted round-nosed tip is placed in the IVC or SVC, and the secondary openings, whether in or near the juncture, rest in the atrium. Finally, it obtains the same result: blood drains from the venae cavae through the slots in the tip of the small-diameter tube, then merges with blood draining from the atrium through the elongated slots in or near the tapered juncture. The ultimate result sought by both the Amrine and Polaris patents is adequate blood drainage by providing an improved venous return catheter capable of use as a single catheter for venous drainage, that avoids the tendency for its drainage openings to become wholly or partially blocked when inserted.

It appears to the court that the primary differences between the Polaris catheter and the Amrine catheter result from RMI's attempt to design around the '129 patent. In the court's view, those attempts were

not only unsuccessful, but resulted in a catheter less efficient than the Amrine catheter as evidenced by RMI's instruction to place the Polaris catheter in the SVC, and the placement of the secondary holes in such a location that the blood must turn a corner before entering the catheter. However, even with these minor pejorative distinctions, the court finds that under the doctrine of equivalents, the Polaris catheter infringes claims 5 and 6 of the '129 patent.

## VII. INDUCEMENT TO INFRINGE

■ The Amrine method claims are claims 1–4. Since the methods defined by these claims constitute surgical techniques using a catheter which are not performed by RMI itself but by surgeons, 3M relies upon 35 U.S.C. § 271(b) as a statutory base for proving infringement of those claims. Section 271(b) provides: "[W]hoever actively induces infringement of a patent shall be liable as an infringer." The burden is upon 3M to prove inducement to infringe by a preponderance of the evidence. To meet its burden, 3M must come forward with proof of direct infringement by the person induced; however, the law allows proof by circumstantial evidence of either direct infringement or the inducement to infringe. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272, 229 U.S.P.Q. 805, 813 (Fed.Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). To establish a case of inducement, 3M must first prove that third parties actually infringed the method claims. *Stukenborg v. Tele-dyne, Inc.*, 441 F.2d 1069, 169 U.S.P.Q. 584 (9th Cir.), *cert. denied*, 404 U.S. 852, 92 S.Ct. 90, 30 L.Ed.2d 92 (1971). Second, 3M must prove that RMI purposefully caused, urged or encouraged that infringer to infringe the '129 patent, with the knowledge that they would infringe. *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1142, 184 U.S.P.Q. 387, 390 (7th Cir. 1975) (liability under section 271(b) arises where the inducement is "active"; the accused party must purposefully cause, urge or encourage another to infringe); *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 411, 137 U.S.P.Q. 84, 87 (5th Cir.1963).

■ It is undisputed that the instructions prepared for use with the Von Berg catheter are identical to those prepared for the Amrine catheter; however, the court is not presented with evidence showing direct infringement by a person induced. The instructions prepared for the Polaris catheter instruct a surgeon to insert the catheter into the SVC unlike the '129 patent instructions to insert the Amrine catheter into the IVC. 3M contends RMI's instructions to insert in the SVC are merely "window dressing" to avoid a claim of inducement to infringe, because surgeons who have already followed the Von Berg instructions to insert the catheter in the IVC will not read the Polaris instructions, and will use the Polaris catheter in an infringing manner. 3M produced no direct or circumstantial evidence of a surgeon who was induced to use the Polaris catheter in an infringing manner except the testimony of Dr. Hutchings, 3M's expert, that he used the Polaris catheter by inserting it into the IVC. His only use of the catheter was in the presence of 3M's counsel, and with 3M's permission. The court finds 3M fails to carry its burden to show, by a preponderance of the evidence, that RMI induced infringement of the '129 patent, and is not moved from that finding by 3M's attenuated argument that asks the court to conjecture whether surgeons would read the RMI's instructions before using the Polaris catheter.

Therefore, 3M fails its burden of proof on the inducement to infringe claim.

## VIII. WILLFUL INFRINGEMENT

■ Having found the Von Berg and Polaris catheters infringe the '129 patent, the court must next address the issue of whether the infringement was willful and deliberate. If willful and deliberate conduct is found, 35 U.S.C. § 284 permits the court, in its discretion, to impose (for exemplary purposes) up to three times the amount of compensatory damages. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 230 U.S.P.Q. 81 (Fed.Cir. 1986), *cert. denied sub nom. Stora Kop-*

*parbergs Bergslags AB v. Crucible, Inc.,* — U.S. ——, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). To avoid a finding of willful infringement, a potential infringer has "an affirmative duty to exercise due care to determine whether or not he is infringing.... Such an affirmative duty includes, *inter alia,* the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity." *Underwater Devices, Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1389–90, 219 U.S.P.Q. 569, 576 (Fed. Cir.1983) (citations omitted). Factors relevant to whether a potential infringer may justifiably rely on a legal opinion include whether (1) there was a patent validity analysis properly predicated on a review of the file histories of the patents at issue that extends beyond just the prior art identified in the file history (*see Central Soya Co. v. George A. Hormel & Co.,* 723 F.2d 1573, 220 U.S.P.Q. 490 (Fed.Cir.1983)) and whether (2) there was an infringement analysis that compared and contrasted the potentially infringing method or apparatus with the patented inventions. *Underwater Devices,* 717 F.2d at 1390, 219 U.S.P.Q. at 576. However, more recently than *Underwater Devices* and *Central Soya,* the Federal Circuit Court said in *Radio Steel & Mfg. Co. v. MTD Prods., Inc.,* 788 F.2d 1554, 1559, 229 U.S.P.Q. 431, 434 (Fed.Cir. 1986):

> [T]he various factors we have discussed in those cases are just that: factors the district court is to consider in determining willfulness. In making that determination, it is "necessary to look at the 'totality of the circumstances presented in the case.'" *Central Soya,* 723 F.2d at 1577, 220 U.S.P.Q. at 492).... We have never suggested that unless the opinion of counsel met all of those requirements, the district court is required to find that the infringement was willful.

The *Radio Steel* Court affirmed the district court's finding of no willful infringement where the alleged infringer received from his patent attorney an oral opinion that the subject patent was not valid, and the attorney gave the opinion after merely examining the patent and without reviewing the prior art or prosecution history. The Court stated those facts did not invalidate the district court's conclusion that the alleged infringer sold its product in the good faith belief it was not infringing the patent, and distinguished the *Radio Steel* facts from scenarios in which willful infringement clearly arises:

> This is not a case in which an outside patent attorney was initially reluctant to give an oral opinion based on the facts before him, but was pressured or coerced into doing so by a client, or in which the client received a number of carefully prepared written opinions but the particular case acted on the basis of an oral, almost off-the-cuff opinion. In those situations the opinion of counsel might not suffice to establish nonwillfulness.

*Id.* 788 F.2d at 1559, 229 U.S.P.Q. at 435.

█ During the beginning stages of RMI's formation, Gary Crocker, RMI's president, learned that Peter Von Berg was selling several product lines in Europe and Canada, and was looking for a distributor in the United States. The product lines included pressure monitoring catheters and monitors, venous return catheters and suction wands. In May, 1983, Crocker traveled to Germany to discuss the matter with Peter Von Berg. Von Berg informed Crocker of the '129 patent, and passed on his opinion that the patent was invalid, but he refused to indemnify RMI against infringement claims. RMI's Director of Research and Development also opined the '129 patent was invalid. Crocker says he was further convinced the '129 patent was invalid after he received a letter, dated August 26, 1983, from his patent attorney reporting that 3M had sued C.R. Bard for infringement of the '129 patent, and C.R. Bard settled and accepted a license because the settlement was less than the company would have spent on litigation even if it had won. The following paragraphs of that letter are relevant to the court's finding on the question of whether RMI obtained a competent opinion from its patent attorney before commencing sale of the Von Berg catheter:

The attorney for Bard indicated that he was convinced that the '129 patent is invalid. However, he was concerned about how easy it appears that various cardiac surgeons throughout the country utilized venous return catheters which were similar to the catheter disclosed in the '129 patent many years before the patent application was filed. If such use could be substantiated, it would invalidate the '129 patent. According to Bard, the surgeons had their catheters custom built by various companies around the country, including Bard. However, the documentary evidence to support these claims is not extensive.

The attorney also indicated that he thought there might be a question concerning inventorship. Thus, it is his opinion that the patent might be invalid because the patent applicant committed fraud upon the Patent and Trade Office. It was the opinion of the attorney that only a cardiac surgeon would have sufficient knowledge to realize that a problem existed and the method by which it could be solved. Thus, the attorney believed the inventor named on the patent did not actually invent the device, but rather, obtained his idea by talking to various cardiac surgeons.

If the theories of Bard's attorney could be proven, there is a strong possibility that the '129 patent owned by 3M could be invalidated and rendered unenforceable. However, we are not in possession of any documentary evidence at the present time on which we can substantiate that opinion.

. . . .

During the next few days, we will evaluate the file history to determine possible areas of weakness in the patent and whether minor modifications could be made to your device to remove it from the scope of the claims.

DX 133.

After receiving the letter, Crocker was convinced the patent was invalid, reasoning "if you really believe that your catheter patent is valid, you don't go out and license it to your largest single competitor." Tr. 550. He felt confident RMI could commence sales of the Von Berg catheter in the United States.

This letter is equivalent if not stronger evidence than that present in *Radio Steel*, that RMI sought and obtained a competent legal opinion concerning validity before it commenced sales of the Von Berg catheter. The court believes that had the *Radio Steel* patent attorney reduced his oral opinion on validity to writing, he would have included the same caveat present here, that is, that the opinion should be substantiated by examination of the prosecution history and prior art. However, here we have the opinion of the Bard patent attorney who, after completing an initial round of discovery in litigation against 3M, determined the patent was invalid and probably unenforceable. The court finds reasonable RMI's reliance on that opinion, and concludes RMI did not willfully infringe the '129 patent by its sales of the Von Berg catheter.

The evidence that RMI did not willfully infringe is even more compelling regarding the Polaris catheter.' Before RMI commenced its Polaris sales, it requested an opinion as to whether their unitary catheter would infringe the '129 patent. On July 30, 1984, counsel prepared an extensive opinion dealing primarily with noninfringement, but also giving an opinion that the patent claims were invalid in view of the information known at the time. RMI's expert witness, Pravel, testified the letter met even the strictest requirements to be considered a competent opinion from counsel. The court agrees, and finds RMI did not willfully infringe the '129 patent by its sales of the Polaris catheter.

## IX. MISCONDUCT

RMI asserts that 3M's refusal to license RMI, after 3M licensed C.R. Bard, constitutes patent misuse and renders the '129 patent in violation of public policy on the basis of unfair discrimination. It argues that 3M has a right not to license, but once it extends a license to one entity, it cannot deny it to another. RMI relies on *Allied Research Prods., Inc. v. Heatbath Corp.,* as supporting authority for the

proposition that a patent is unenforceable if the patentee refuses to license an applicant when it has already granted a license to the applicant's competitor. 300 F.Supp. 656, 664, 161 U.S.P.Q. 527, 537 (N.D.Ill. 1969). RMI correctly states the holding in that case; however, *Allied Research* contains not a single citation as precedent for that position, and it has never been followed in any jurisdiction. More importantly, it reaches a conclusion that is directly opposite that reached by its own Seventh Circuit Court. In *Extractol Process Ltd. v. Hiram Walker & Sons Inc.*, 153 F.2d 264, 268, 68 U.S.P.Q. 128, 131 (7th Cir.1946), the Court stated:

> It was clearly within [the patentee's] right to grant to one party a license to make an article, and to sell the same, and a license to use the article to another party. The patentee is the sole judge of the licensee he shall select, to make, to sell, or to use his patented article. Patentee's reasons for selection of its licensee are of no concern to others. No legitimate attack can be made on the patent or patent grant because the patentee chooses A and B as its licensees and refuses a license to X, Y, or Z.

Although *Extractol* does not cite precedent for its holding, it terms "well-settled law" the notion that the patentee is free to license in any manner it desires. In the absence of further authority to the contrary, this court is persuaded to follow *Extractol,* and find that 3M's refusal to license RMI does not constitute misconduct that would render the '129 unenforceable.

## X. CONCLUSION

Based upon its findings, the court concludes the '129 patent is invalid and unenforceable on all claims. The Von Berg catheter infringed the '129 patent claims 5, 6 and 7; and the Polaris catheter infringed the '129 patent claims 5 and 6.

## XI. ATTORNEY'S FEES

██ Under 35 U.S.C. § 285, the court may, in exceptional cases, award reasonable attorney's fees to the prevailing party. A showing of inequitable conduct gives rise to an award of attorney's fees. *See Bott v. Four Star Corp.,* 807 F.2d 1567, 1 U.S.P.Q. 2d 1210 (Fed.Cir.1986) (factors that can support an award of attorney fees in patent cases are willful infringement, unfairness, bad faith, inequitable conduct or fraud, vexatious litigation or some similar circumstance); *see Korody–Colyer,* 760 F.2d 1293, 225 U.S.P.Q. 1099; *Stevenson v. Sears, Roebuck & Co.,* 713 F.2d 705, 218 U.S.P.Q. 969 (Fed.Cir.1983). Therefore, based upon its finding 3M engaged in inequitable conduct, the court awards reasonable attorney's fees to RMI.